UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| CAROLYN ENZOR, as Next Friend of K.E. and K.E., minors, and JULIANNE GLISSON, as Administrator of the Estate of KA'LA ENZOR, <br><br>Plaintiffs, <br><br>v. <br><br>THE KROGER CO., <br><br>Defendant. | Civil Action No. <u>CV422-083</u> <br><br>JURY TRIAL DEMANDED |

### PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF KARIM VELLANI

COME NOW Plaintiffs and file this Motion to Exclude the Testimony of Defendant The Kroger Co.'s (hereinafter "Kroger") expert witness Karim Vellani, as follows:

### STATEMENT OF FACTS

This matter arises from the battery, kidnapping, and rape of Ka'La Enzor inside the public restroom of Kroger Store No. 645, which is located within the Berwick Shopping Center at 5720 Ogeechee Rd., Savannah, Georgia. (Exhibit A, Chatham County Police Report; Exhibit B, Kroger Incident Report). On April 27, 2021, Carolyn Enzor asked her daughter, Ka'La Enzor, to go to the Berwick Kroger and pick up some items for dinner. (Exhibit C, Carolyn Enzor Depo., 45:13-21). Ka'La Enzor and her boyfriend, Alan Johnson, arrived at the Berwick Kroger in the evening and began shopping. (Exhibit D, Alan Johnson Depo., 10:20-25). Soon after, Ms. Enzor walked down a long hallway that led to the women's restroom. (*Id.*). Unbeknownst to Ms. Enzor, Gregory Hathorne had previously entered the women's restroom and was inside a stall. (Exhibit A).

1

Hathorne emerged, grabbed Ms. Enzor by the throat, pushed her back into the stall, and violently raped her. (Exhibit A).

Diana Avramova, a Kroger employee, heard Ms. Enzor's screams and found another employee to enter the restroom with her. (Exhibit A; Exhibit E, Diana Avramova Depo., 70:15-25, 71:1-2). Hathorne was still within the restroom but he ran out when the Kroger employees approached. (Exhibit E, 71:1-25). Kroger Store No. 645 employed no security personnel; so, a Marine shopping in the store chased Hathorne and held him until the police arrived. (Exhibit E, 28:11-23, 72:1-4).

Ka'La Enzor's life essentially ended on April 27, 2021. In the months to follow, Ms. Enzor experienced nightmares and frequently slept on her mother's couch. (Exhibit D, 22:2-17, 23:). Ms. Enzor began drinking heavily. (Exhibit D, 22:21-25). In fact, she began drinking a bottle of Bacardi rum every day and slept with the bottle. (Exhibit D, 23:1-16). Ms. Enzor withdrew from everyone, including her two young children. (Exhibit D, 24:3-25, 26:14-22). On August 6, 2021, Ka'La Enzor passed away in bed with her child at the age of twenty-six from a seizure caused by chronic ethanolism. (Exhibit C, 42:7-25; 43:13-16; Exhibit F, Death Certificate).

## **KARIM VELLANI'S OPINION**

On March 15, 2023, Kroger disclosed that its security expert in this case is Karim Vellani and produced an accompanying report with his opinion. (Exhibit G, TAG report). Mr. Vellani offers one opinion in this matter.

> "1. In light of the crime risk, Kroger 645 had reasonable security program which consisted of a multi-pronged approach to mitigating risk. Defendants met the applicable standard of care relating to security."

(Exhibit G, 21).

Karim Vellani is the owner of Threat Analysis Group and lives and works in Texas. (Exhibit H, Karim Vellani Depo., 45:22-25, 46:1-11). Mr. Vellani has never worked as a security guard, never worked as a store manager, and never worked in law enforcement or in the military. (*Id*., 17:2-18). Mr. Vellani has been working as a consultant and expert witness since he started his business in college. (*Id*., 12:16-19). Over the past four years, Mr. Vellani has been retained to provide expert testimony in at least thirty-five cases, all on behalf of defendants. (*Id*., 63:4-9, 66:19-25, 67:1-3). Mr. Vellani is currently retained to provide expert testimony in twenty active cases. (*Id*., 64:1-13).

Mr. Vellani has been retained by Kroger on numerous occasions in both a consulting role and as an expert in litigation. (*Id*., 68:15-25, 69:1-2, 70:4-15, 71, 72:1-9). Currently, Mr. Vellani is employed by Kroger in the present case and a Texas case. (*Id*.). Previously, Kroger retained Mr. Vellani in 2018 as its security expert in a premises case that involved the shooting and paralysis of a Navy veteran at a Kroger store located in Dekalb County, Georgia. (Exhibit I, Oral Deposition of Karim Vellani on July 12, 2018). Mr. Vellani testified in that case almost identically as he has in the present:

> Q. So you only have one opinion, that Kroger met the standard of care for commercial retail property owner when it comes to provision of security and the other two are sub-elements of it?
>
> A. Correct.

(Exhibit I, p. 48). The Dekalb jury disagreed with Mr. Vellani's opinion and awarded the plaintiff a substantial verdict against Kroger.[1] During his deposition in the present case, Mr. Vellani was

---

[1] https://thecrimereport.org/2019/04/23/ga-jury-returns-70m-verdict-in-kroger-shooting-case/

unable to recall the name of the plaintiff or even the facts of the Dekalb case. (Exhibit H, 69:1-25, 70:1-3).

In this case, as in the Dekalb case, Mr. Vellani has proffered an opinion that he claims to be based upon the IAPSC "Forensic Methodology." (Exhibit G, 6; Exhibit I, 64:3-11). Mr. Vellani claims to use four factors (similarity, frequency, recency, and proximity) to assess crime risks. (Exhibit G, 6). Mr. Vellani also claims to consider additional guidance from industry accepted practices and governmental sources. (*Id*.). In doing so, Mr. Vellani reaches his sole opinion that Kroger had "a multi-pronged approach to mitigating risk" and therefore "met the applicable standard of care relating to security."

The issues with Mr. Vellani's opinion are twofold. First, Mr. Vellani employs a strict methodology that only considers prior, identical crimes that occurred in the exact location of Ms. Enzor's attack (the Kroger restroom) to develop his risk assessment. This strict methodology is unreliable nor is it the standard upon which Georgia courts rely. Furthermore, to allow Mr. Vellani to provide testimony based on an assessment that is contrary to Georgia law is not helpful to jurors. Second, Mr. Vellani disregards the fact that Kroger's "security program" at the Berwick Kroger is entirely non-existent. These issues are discussed in detail below and demonstrate that Mr. Vellani should be prohibited from testifying at trial because his opinions are based upon an unreliable methodology contrary to Georgia law nor are they helpful to jurors.

## ARGUMENT AND CITATION OF AUTHORITY

### I. ADMISSIBILITY STANDARD FOR EXPERT TESTIMONY.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court concluded that Fed. R. Evid. 702 "compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert scientific evidence." *United States v. Frazier*, 387

F.3d 1244, 1260 (11th Cir. 2004) (*citing Daubert*, 509 U.S. at 589 n.7, 597).  It is further held that "*Daubert's* general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citing Fed. R. Evid. 702). Incorporating these decisions, amended Rule 702 provide as follows:

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliability applied the principles and methods to the facts of the case."

Fed. R. Evid. 702.

In this circuit, the Court applies a three-pronged inquiry to determine whether an expert's testimony complies with Rule 702 and Daubert. The Court must determine whether:

(1) The expert is qualified to testify competently regarding the matters he intends to address;

(2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and

(3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*Frazier*, 387 F.3d at 1260 (citations omitted).  The proponent of the expert opinion bears the burden of establishing qualification, **reliability**, and **helpfulness** by a preponderance of the evidence. *Daubert*, 509 U.S. at 592, n. 10.

Here, Kroger cannot satisfy its burden because Mr. Vellani's opinions are the product of an unreliable methodology nor helpful to a jury because they are based upon a subjective and restrictive analysis contrary to Georgia law.

**II.    KARIM VELLANI'S SOLE OPINION (THAT KROGER MET THE STANDARD OF CARE) DOES NOT SATISFY THE RELIABILITY REQUIREMENTS OF RULE 702 AND *DAUBERT*.**

The reliability "criterion remains a discrete, independent, and important requirement for admissibility." *Frazier*, 387 F.3d at 1261. "*Daubert* set out a list of 'general observations' for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702." *United States v. Brown*, 415 F.3d 1257, 1267 (11th Cir. 2005) (citation omitted). These factors, or observations, inquire into the expert's "theory or technique" and are: "(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field." *Id.* (citation omitted). "Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful." *Frazier*, 387 F.3d at 1262. More specifically, "Indeed the Committee Note to the 2000 Amendments of Rule 702 expressly says that, '[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Id.* at 1261.

The Georgia Supreme Court recently issued an opinion clarifying that "the reasonable foreseeability of a third-party criminal act is a determination linked to a proprietor's duty to keep the premises and approaches safe under OCGA § 51-3-1, and that the totality of the circumstances informs whether a third-party criminal act was reasonably foreseeable." *Georgia CVS Pharmacy,*

*LLC v. Carmichael*, No. S22G0527, 2023 WL 4247591, at *1 (Ga. June 29, 2023). "[T]he pertinent question is whether the totality of the circumstances relevant to the premises gave the proprietor sufficient 'reason to anticipate the criminal act' giving rise to the plaintiff's injuries on the premises. This determination is not susceptible to a mechanical formulation and instead must be made on a case-by-case basis." *Id*. at 5. Instead, the relevant question is whether the **totality of the circumstances** establish reasonable foreseeability such that a proprietor has a **duty** to guard against that criminal activity. *Id*. at 9.

Specifically, the Georgia Supreme Court clarified that "[p]rior crimes need not be identical to the crime in question to be relevant evidence bearing on foreseeability." The fact that prior crimes occurred "in the store (as opposed to in the parking lot), were committed against employees (as opposed to customers), and did not involve the discharge of a weapon do not, as a matter of law, establish that they were so dissimilar or so remote to make them improper for consideration with respect to the proprietor's duty." *Id*. When viewed as part of the totality of the circumstances, prior crimes (regardless of location), are sufficient evidence to attract a proprietor's attention to the dangerous condition which resulted in the litigated incident and to undertake a du**t**y to protect against. *Id*. (emphasis added).

> A.  **Mr. Vellani limited his risk analysis solely to the consideration of prior crimes that occurred within the Berwick Kroger restroom contrary to Georgia law**.

In his deposition, Mr. Vellani acknowledges that his book, *Strategic Security Management: A Risk Assessment Guide For Decision Makers, Second Edition*, contains a chapter that addresses the importance of analyzing a property's risk by utilizing the totality of the circumstances methodology:

> "The major problems with prior similar crime rules is the lack of clear direction on what constitutes similar . . . The more contemporary approach to analyzing foreseeability is the totality of the circumstances rule. Under this rule, evidence

7

> is typically allowed to show   the existence of prior dissimilar crime, crime in the neighborhood and other factors to determine whether a crime is foreseeable. By using the totality of the circumstances approach to evaluate the level of risks, owners and managers will be able **to assess the risk of crime** at their properties than if they restricted their analysis to only prior crimes."

(Exhibit H, 54, 55:1-9).  Mr. Vellani acknowledges the chapter but strangely argues that its analysis has "nothing to do with risk assessments," despite its clear language.  (*Id*., 55:12-23). Mr. Vellani further attempts to distinguish this analysis by providing his perspective on Georgia law which is, in his opinion, "tighter" and not applicable "if we're talking about Georgia law." (*Id*.).

That said, Mr. Vellani reaches his desired opinion based upon pure conjecture by his omission of prior crimes at and surrounding the Berwick Kroger.  For example, Mr. Vellani purports to form his analysis of crime at the Berwick Kroger based upon Chatham County Sheriff data and Kroger internal incidents reports.  (Exhibit G, 14).  Mr. Vellani uses this information to chart approximately (85) crimes that occurred solely within the Berwick Kroger and its parking lot for three years prior to Ms. Enzor's attack. (Exhibit G, 14-16).  From there, Mr. Vellani extracts only (3) "violent" crimes that he deems potentially "relevant" to his analysis.  (Id., 16).  However, Mr. Vellani decides they are not relevant to his analysis because they did not occur in the Berwick Kroger restroom.  (*Id*., 16). Mr. Vellani then recognizes an additional (2) violent crimes listed in the Berwick Kroger's internal incident reports, including a 2018 assault by a customer on another customer within the store. (*Id*., 19).  Mr. Vellani again disregards the attack noting the Berwick Kroger "is not aware of any prior assaults in the restroom of Kroger 645." (*Id*., 19).

In his deposition, Mr. Vellani was shown Chatham County Police Reports reflecting additional crimes that occurred either within the Berwick Kroger or in the parking lot that he did not consider in his analysis.  (Exhibit H, 151-158; Exhibit J, Plaintiffs' Ex. 7 to Karim Vellani Depo.).  Specifically, Mr. Vellani was shown: a 2017 armed robbery attempt of the Starbucks kiosk

within Kroger; a 2018 assault where a woman was put in a headlock within Kroger and thrown to the ground; a 2020 assault where woman's neck was slashed in the Kroger parking lot; a 2020 abduction of a person behind the Goodwill store which is connected to Kroger; a 2020 armed robbery within the Berwick shopping center; and a 2021 shooting of a vehicle in the Kroger parking lot. (*Id*.). Mr. Vellani reviewed each report and concluded that none affected his opinion as the incidents were dissimilar and did not occur within the Berwick Kroger restroom. (*Id.*).

Finally, Mr. Vellani's report offers a chart that he created purporting to reflect the Crime Rate for the Berwick Kroger as compared to the Crime Rate for Chatham County. (Exhibit G, 17-18). Mr. Vellani defines the Crime Rate "as the ratio of crimes in an area to the population of that area. (*Id*., 17). Crime Rates are typically expressed per 1,000 population per year." (*Id*., 17). Mr. Vellani uses his chart to conclude that the Berwick Kroger "had a low stranger violent crime rate in the three years preceding the Subject Incident." (*Id*.). Mr. Vellani's chart is entirely unreliable because he intentionally limits the subject area to the Kroger store (excluding the parking lot and shopping center). Most concerning, Mr. Vellani admits that he only compared his relevant crimes within the Berwick Kroger store to only the 2018 crime data for Chatham County as it "did not report to the Uniform Crime Report program from 2019 to 2021." (*Id*., 18).

In summary, Mr. Vellani's Crime Risk analysis is the product of complete conjecture formed by his omissions of prior crimes at and surrounding the Berwick Kroger as well as crimes in Chatham County for years 2019 through 2021. As such, Mr. Vellani's analysis is entirely unreliable and contrary to the Georgia Supreme Court's analysis in *Carmichael*, 2023 WL 4247591, at 9. Mr. Vellani should therefore be prohibited from offering any crime risk opinions to the jury.

>       B.      **Mr. Vellani provides no evidence that Berwick Kroger had a security plan, much less a reasonable one, at the time of Ms. Enzor's attack.**

In his report, Mr. Vellani states "[t]he analysis I conducted included the assessment of inherent threats as required by the Forensic Methodology. Inherent threats consider the 'crime risk at the subject property as determined by the expert based on the property's characteristics, the expert's research and/or experience in similar environments, information gathered through the discovery process, and/or a site inspection (if conducted).' Rapes are not an inherent threat in grocery stores." (Exhibit G, 18).

Mr. Vellani performed his entire assessment of the Berwick Kroger from the comfort of his home office in Sugar Land, Texas. Mr. Vellani has never been to the Berwick Kroger much less performed a site inspection of the store and its premises. (Exhibit H, 80:1-6)  Mr. Vellani never inspected or photographed the Berwick Kroger restroom, offers no opinions on its location or layout, nor interviewed any of its employees. (*Id*., 80:7-25; 81:1-4). Mr. Vellani does not know if and what portion of the parking lot that Kroger owned and occupied, nor did he consider it relevant to his analysis. (*Id*., 57:11-25; 58:1-2).[2]

Although Mr. Vellani notes that Kroger allocates security resources based on risk identified through a "comprehensive security risk assessment methodology called a Security Matrix," Mr. Vellani fails to identify any real security measures allocated to and utilized by the Berwick Kroger. (Exhibit G, 20).  For example, the Berwick Kroger employed no security personnel whatsoever at the time of Ms. Enzor's attack. Berwick Kroger employee, Dianna Avramova testified that the Berwick Kroger *used* to employ security guards 24/7 approximately eight to ten years ago. (Exhibit E, 26:11-24).  During that time, a security guard was stationed at the front door where

---

[2] Defendant Kroger Co. owns and occupies 8.77 acres of the Berwick Shopping Center, or almost the entirety of the parcel. (Exhibit K, SAGIS Map and Property Record Card).

customers would enter and exit. (*Id*., 27:12-25). However, the Kroger Co. removed the security guards because they decided to remove their cost from the budget. (*Id*., 28:14-23). In his book, Mr. Vellani recognizes not only the importance of security guards but also "it is dangerous to withdraw security personnel based on cost concerns. This danger will be recognized by security decision-makers with any amount of seat time in a deposition or trial subject to questioning by an attorney representing a person victimized under the security decisionmaker's property." (Exhibit H, 96:16-25, 97:1-6).

Mr. Vellani further touts that Kroger employees are the "eyes and ears of the store." (Exhibit G, 20). However, Diana Avramova testified that she has no idea who is the person in charge of security at the Berwick Kroger because "in this position we don't have nobody so I'm not sure." (Exhibit E, 29:11-13). Ms. Avramova further testified that in her thirteen years of employment at the Berwick Kroger, she was never required to attend a meeting where security procedures were discussed. (Exhibit E, 29:14-18). Apparently, only two division managers, who oversee 183 stores in their district, and the individual store managers, possess any training on security procedures involving the dangers of third parties. (Exhibit G, 19, Exhibit H, 86:24-25, 87, 88, 90:8-25).

Most concerning, Mr. Vellani offers Kroger's Security Matrix as a reliable model that accurately places a "qualitative risk rating" to each store based upon three sets of data: the CAP Index Score, Loss Prevention Management System, and shrinkage data. (Exhibit G, 19; Exhibit H, 150:1-9). These sound like sophisticated terms, but they are not when you peel back their layers. The only term that appears to be reliable, and of concern to Kroger, is the product shrinkage data[3]

---

[3] Shrinkage is a retail term which describes when a store has fewer items in stock than its recorded book inventory.

which employees receive every morning. (Exhibit E, 38:17-25, 39). On the other hand, the CAP Index Score is a third-party subscription service that attempts to provide a risk score for each Kroger store using "demographic characteristics" of a one-to-three-mile radius surrounding the store. (Exhibit H, 146:6-17). However, these CAP Index Scores reflect no actual crimes but simply risks based on the demographics of a certain community. (*Id*., 147:10-24). In fact, neither Mr. Vellani nor Kroger's Asset Division Manager, Scotlon Hughes, even understand how this software works. (Id., 146:22-25, 147:1-6).

The third component, Loss Prevention Management System ("LPMS"), is Kroger's internal, security reporting software that allows district and store managers to enter criminal incidents that occur at Kroger locations. (Exhibit G, 19; Exhibit H, 161:1-14). The problem with this software is that Kroger allows the person inputting a specific criminal incident complete discretion and subjectivity in how the incident is "coded." (Exhibit L, Scotlon Hughes Depo., 75:1-10). By way of example, Mr. Hughes was shown a Chatham County police report from July 14, 2018, that was designated as a "sexual assault" at the Berwick Kroger. (Exhibit L, 76:18-25). Mr. Hughes was then shown a Kroger LPMS printout for the same date. (*Id*., 77:1-5). Mr. Hughes testified that the incident was classified by Kroger as "other." (*Id*.). Mr. Hughes was subsequently shown additional Chatham County police reports, including the attack on Ka'La Enzor on April 27, 2021, and asked, again, to identify the incident on the Kroger LPMS printout. (*Id*., 70:13-25). Mr. Hughes testified that Ms. Enzor's attack was not even listed on the Kroger LPMS printout which is confirmed by a simple review of the document. (*Id*.; Exhibit M, Berwick Kroger LPMS Printout).

Kroger admittedly relies upon these three data sources to assign a security rating to each store. The importance of this rating cannot be overstated. The rating determines the specific

resources allocated to each individual store for security purposes. Additionally, Mr. Vellani relied heavily upon this data in reaching his conclusion that "Kroger had a reasonable security program which consisted of a multi-pronged approach to mitigating risk." However, these data sources are entirely unreliable because they rely upon speculative and subjective information. Although there is clear evidence of assaults and robberies on the Berwick Kroger for the years 2017 through 2019, Kroger was able to assign its Berwick Kroger location a "Medium" risk score listing "0" robberies and "0" assaults for those years. (Exhibit N, Kroger Security Rating). Because he relies so heavily upon this unreliable data, Mr. Vellani should therefore be prohibited from offering testimony that Kroger had a reasonable security program.

### III. KARIM VELLANI'S SOLE OPINION (THAT KROGER MET THE STANDARD OF CARE) DOES NOT SATISFY THE HELPFULNESS REQUIREMENTS OF RULE 702 AND *DAUBERT*.

"The final requirement for admissibility of expert testimony under Rule 702 is that it assist the trier of fact. By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262; *see also United States v. Rouco,* 765 F.2d 983, 995 (11th Cir.1985) (expert testimony admissible if it offers something "beyond the understanding and experience of the average citizen"). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. *Id*. at 1263 *(*internal citations omitted*)*.

"Because of the powerful and potentially misleading effect of expert evidence, *see Daubert,* 509 U.S. at 595, 113 S.Ct. at 2798, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403. *Frazier*, 387 F.3d at 1263. "Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, *see Rouco,* 765 F.2d at

13

995, or if the expert testimony is cumulative or needlessly time consuming." *Frazier*, 387 F.3d at 1263; *see also United States v. Stevens,* 935 F.2d 1380, 1399 (3d Cir.1991) (finding expert testimony properly excluded because its probative value was outweighed by concerns of "undue delay, waste of time, or needless presentation of cumulative evidence").

"Indeed, the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than over lay witnesses." *Frazier*, 387 F.3d at 1263; *see also Salem v. U.S. Lines Co.,* 370 U.S. 31, 35 (1962). "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Frazier*, 387 F.3d at 1263.

Here, Mr. Vellani's testimony and sole conclusion is unhelpful to a jury because it is premised on a restrictive and deficient analysis of prior crimes contrary to Georgia law. Mr. Vellani's testimony is also unhelpful because he relies upon unreliable data based upon speculative third-party software and a subjective internal reporting system created by Kroger.

Furthermore, Mr. Vellani fails to offer any helpful standard of care that is applicable to Kroger. Although he claims to consider "guidance from industry accepted practices," Mr. Vellani provides the bizarre conclusion that for a business to be held accountable to an industry guideline or standard, the business must somehow "voluntarily" adopt the guideline or standard as its own. (Exhibit H, 29:6-25, 30:1-3, 31). In fact, Mr. Vellani believes that only ordinances or laws must be followed by businesses. (Exhibit H, 30:4-14). Through this novel reasoning, Mr. Vellani concludes that Kroger's decision not to adopt any industry guidelines or standards renders them entirely immune from any critique by a security expert for failing to adhere to generally accepted industry standards. (Exhibit H, 104:7-19). This opinion makes no sense nor is it helpful to a jury

14

deciding allegations of negligence. If an expert believes that no industry standards apply to a business, how can that expert develop and promulgate an applicable standard of care for that business? The answer is simple. He cannot.

Although mistaken, Mr. Vellani remains never in doubt that Kroger is afforded the luxury of not having to adhere to any industry standards. This becomes abundantly clear when he is asked:

> Q. Okay. Do you think that there's anything that Kroger could have done to prevent Ms. Enzor's kidnapping, battery, and rape?
>
> A. Nothing reasonable.
>
> Q. Nothing reasonable? What would be unreasonable if you have an opinion?
>
> A. Shut down the store.
>
> Q. Shut down the store. Prior to her arrival?
>
> A. Shut down the store period. Close it down.

(Exhibit H, 121:4-14). This type of hyperbolic testimony is not helpful to jurors, nor does it deserve to be heard in this Court. For the reasons discussed herein, Mr. Vellani should be prohibited from offering any testimony in this matter because his testimony will not assist jurors.

## CONCLUSION

Mr. Vellani's opinions are unreliable because they are premised upon a restrictive and deficient analysis of prior crimes contrary to Georgia law. Mr. Vellani's testimony is likewise unhelpful because he offers no discernable standard of care predicated upon unreliable data derived from speculative third-party software and a subjective internal reporting system created by Kroger. Plaintiffs request that the Court exclude his testimony in its entirety. In the alternative, Plaintiffs request that the Court limit his testimony.

Respectfully submitted this 17th day of July, 2023.

                                                        **MANLY SHIPLEY, LLP**

| | |
|---|---|
| Post Office Box 10840 | /s/ John B. Manly |
| Savannah, Georgia 31412 | JOHN B. MANLY |
| T: (912) 495-5360 | Georgia Bar No. 194011 |
| F: (844) 362-4952 | JAMES E. SHIPLEY, JR. |
| john@manlyshipley.com | Georgia Bar No. 116508 |
| jim@manlyshipley.com | *Attorneys for Plaintiffs* |

                                                        **ANDREWS & SANDERS**

| | |
|---|---|
| 327 West York Street | /s/ Richard Sanders |
| Savannah, Georgia 31401 | RICHARD A. SANDERS, JR. |
| T: (912) 341-6861 | Georgia Bar No. 119508 |
| F: (912) 236-3020 | *Attorney for Plaintiffs* |
| richard@andrews-sanders.com | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was filed using the CM/ECF system and served upon counsel of record and/or the parties.

This 17th day of July, 2023.

                                               **MANLY SHIPLEY, LLP**

                                               /s/ John B. Manly
                                               JOHN B. MANLY
                                               Georgia Bar No. 194011
                                               *Attorney for Plaintiffs*

Post Office Box 10840
Savannah, Georgia 31412
T: (912) 495-5360
F: (844) 362-4952
john@manlyshipley.com