# EXHIBIT H

**Excerpts of the Deposition of Karim Vellani**

**Pages:  11-18, 27-34, 43-46, 51-58, 63-74, 79-90, 95-98, 103-106, 119-122, & 143-163**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

CAROLYN ENZOR, as Next              )
Friend of K.L.N.E. and             )
K.A.E. and JULIANNE                 )   CIVIL ACTION FILE
GLISSON, as Temporary              )
Administrator of the                )   NO.: CV422-0836
Estate of Ka'La Enzor,             )
                                    )
            Plaintiffs,             )
                                    )
        vs.                         )
                                    )
THE KROGER CO.,                     )
                                    )
_____Defendant._____       )


VIDEOCONFERENCE DEPOSITION OF

KARIM H. VELLANI, CPP, CSC


10:02 a.m.


June 14, 2023


Sugar Land, Texas


Annette Pacheco, RPR, RMR, CCR-B-2153


## Gilbert & Jones
Certified Court Reporters

P. O. Box 1894 (31521)
1607 Norwich Street
Brunswick, GA 31520

gilbertandjones1@gmail.com
912.264.1670

P. O. Box 14515 (31416)
7505 Waters Avenue, F3
Savannah, GA 31406

**11**

1    Q.    Okay.  What was your title there?  Do you
2  remember?
3    A.    Yeah.  They had a bizarro made-up title
4  called the law enforcement advisor.
5    Q.    Okay.  How long -- how long --
6    A.    Can I clarify real quick.
7    Q.    Yeah, go ahead.
8    A.    So at some point, the state of Texas while
9  I was working there passed a requirement for security
10  consultants to be registered.  So I think that
11  official government title would be security
12  consultant, but OSS had a, you know, internal title
13  called law enforcement advisor.
14    Q.    Okay.  Did it have to do with training law
15  enforcement?
16    A.    Yes, sir.
17    Q.    Okay.  Was that the majority of the focus
18  of the job, training law enforcement?
19    A.    My focus?  No.  That was -- that was the
20  smallest part of what I did.  So the biggest part of
21  what I did was security consulting for OSS's
22  commercial and residential clients, and then
23  assisting the owner who served as an expert witness.
24  So I would get involved in the litigation cases.
25    Q.    All right.  How long did you work for
                    GILBERT & JONES

**12**

1  those guys?
2    A.    Two years.
3    Q.    Two years.  And then at some point after
4  that you began your master's program; is that
5  correct?
6    A.    During.
7    Q.    During?
8    A.    Yes, sir.
9    Q.    Okay.  And what was your master's in?
10    A.    Criminal justice management.
11    Q.    Okay.  During the master's program, did
12  you quit working with OSS or did you keep working
13  there the entire time during your program?
14    A.    No.  I left OSS while I was in the
15  master's program.
16    Q.    Okay.  And when you graduated the master's
17  program, is that when you started your company?
18    A.    No.  I started my company while I was in
19  the master's program.
20    Q.    Okay.  Gotcha.  I saw another thing on
21  your CV it says, "Significant portion of career 11
22  years managing quality control assurance function for
23  U.S. Department of Homeland Security protection
24  forces in 23 states."  What was that job?
25    A.    So it started off where at the beginning
                    GILBERT & JONES

**13**

1  when I started the company, it was not viable.  First
2  year didn't make much money.  Second year made some
3  more money but not enough to survive.
4         So I looked for a job to supplement the
5  consulting income.  So I worked for a company SCG,
6  Inc., which is Security Consultants Group, Inc.  That
7  was a prime contractor to GSA's federal protective
8  service.
9         After 9/11, which was shortly after I
10  started working for them, you know, 9/11 occurred and
11  the federal protective service moved under Department
12  of Homeland Security.  And prior to that, OS -- I'm
13  sorry, SCG asked me to take on more of those
14  projects.
15         So the short version at this point is that
16  I had 40 some odd retired, primarily retired FBI
17  agents.  In some cases like Kentucky, there's no FBI
18  agents that live there, at least not at that time.
19  So I had retired state, Kentucky state troopers that
20  worked for me.
21         So what we would do is go into about 700
22  federal buildings on a monthly basis and inspect
23  about a thousand security officers on a monthly
24  basis.  And I'm talking about peak numbers here.  The
25  contracts would come and go occasionally.  Primarily
                    GILBERT & JONES

**14**

1  they were being added, added, added.  So the contract
2  continued to grow over time.
3    Q.    Okay.  So you just said you oversaw
4  retired troopers, and within a government contract,
5  you would go in and inspect security officers?  Is
6  that with the Department of Homeland Security?
7    A.    So it was retired troopers in Kentucky.
8  It was mostly retired FBI agents in all 22 other
9  states.  So it was a -- I had a subcontract from a
10  prime contractor to Homeland Security.
11    Q.    When you say you would inspect security
12  officers, what did that mean?
13    A.    So there was -- I'm trying to recall all
14  of it now.  So it's probably broken down into three
15  categories.  One is DHS's requirements for security
16  officers.  So that's the government criteria.
17         Then the second part of it was the prime
18  contractor's criteria, which was the second layer of
19  inspection.
20         And then the third was, you know, just
21  general morale, documentation, that kind of thing.
22    Q.    Okay.  And so you would run background
23  checks?  I guess a dumbed-down version of that would
24  be would you run background checks on, you know,
25  these officers or contractors to make sure that they
                    GILBERT & JONES

**15**

1  were -- they had no criminal past or they were
2  trustworthy or something like that?
3      A.   No. It had nothing to do with that. That
4  was already done by SCG and DHS. They would -- all
5  the officers were already cleared.
6      Q.   Okay.
7      A.   This was going in and inspecting to make
8  sure that they were compliant with what is called the
9  SGIM, which is a security I think it's called
10 Security Guard Information Manual, which is the
11 federal contract manual specifically designed for
12 security officers.
13          And then I would also inspect them to
14 ensure that they were complying with company policy.
15     Q.   Which company?
16     A.   SCG.
17     Q.   Okay. So you're over -- let's see.
18 Retired DHS officers. So are you overseeing -- I'm
19 just a little confused -- through this private
20 corporation employees of the federal government,
21 Department of Homeland Security? Is that what you're
22 saying?
23     A.   No. They're contractors. So let me see
24 if I can explain all this. So at some point I was an
25 employee of SCG. A short amount of time I was doing

**16**

1  boots-on-the-ground work. I was the one doing the
2  inspections. So I was running around the federal
3  buildings in Houston, in, I think, north Texas.
4          And then at some point they wanted me to
5  expand the operation and become a contractor and
6  start taking on more contracts. So I would then hire
7  retired FBI agents to go and do these inspections.
8          I was no longer an employee. The FBI
9  agents were not employees. We were contractors. The
10 security officers that we were inspecting worked for
11 SCG as employees. SCG was then a prime contractor to
12 Homeland Security.
13     Q.   Okay. So you were just making sure that
14 the officers that SCG employed were contracted out to
15 the Department of Homeland Security were doing their
16 job; is that fair?
17     A.   Well, doing their job, but, yeah, there's
18 more to it than that. But, yeah, like it was those
19 three areas. Right? So are they compliant with the
20 SGIM, which is the Homeland Security document? Are
21 they compliant with company policy, which would be an
22 SCG document? And then thirdly would be, you know,
23 do they have their equipment with them? Do they
24 have -- are they properly documenting incidents in
25 their logs and time sheets and all that kind of

**17**

1  stuff?
2      Q.   Okay. Gotcha. Have you ever in your
3  career worked as a security guard?
4      A.   No.
5      Q.   Okay. Have you ever worked as a store
6  manager over -- as any kind of a store manager ever
7  like a retail outfit, a grocery store, any type of
8  business or anything like that?
9      A.   So let's go back further. I managed a
10 dry-cleaning facility. I worked in retail at a
11 record store.
12     Q.   Okay. Was that --
13     A.   Everything else I did was --
14     Q.   Was that before you went to college or
15 during college or --
16     A.   Well --
17     Q.   High school?
18     A.   All of the above.
19     Q.   Okay.
20     A.   And let me also be clear about something.
21 So when I left OSS and prior to starting my company,
22 I needed startup capital. So I went to go work for a
23 company called Texas One Security. And for them, I
24 was an operations manager. I don't know that the
25 operations manager had a separate license, but it

**18**

1  might have been -- I might have been licensed as a
2  security officer or security manager under the
3  Texas -- at that time it was called Texas Security
4  Bureau.
5      Q.   Texas One Security. Is that a private
6  security firm in Texas?
7      A.   Yes, sir. It was.
8      Q.   All right. Okay. How long did you work
9  for those guys?
10     A.   If memory serves, it was about five months
11 maybe.
12     Q.   Okay. In all this, it sounds like, you
13 know, you needed extra income to supplement the
14 creation or the startup of your own security firm; is
15 that correct?
16     A.   Yes.
17     Q.   All right. When did you become -- when
18 did you leave being employed by any other private
19 entity or to focus solely on your security business?
20     A.   So I started my firm March 12th, 1997.
21     Q.   Uh-huh.
22     A.   I don't know the exact dates of
23 employment. I've had two other supplements other
24 than that. One was SCG as an employee. I don't
25 remember exactly how long I was an employee versus a

**27**

1  appendix to my report.
2      Q.    Right.  But why would you have it listed
3  as an appendix in your report if you didn't rely on
4  it?  What's the point of putting it in there?
5      A.    I don't know if I follow your question.  I
6  am putting reference to the forensic methodology in
7  my report, and then I provided you a copy of the
8  forensic methodology, which then references ASIS.  I
9  did not specifically reference ASIS in the body of my
10  report.
11      Q.    Okay.  But you acknowledge -- so you put
12  the forensic methodology in there which you rely on
13  heavily and reference throughout your report;
14  correct?
15      A.    Yes.
16      Q.    And as a basis for forensic methodology,
17  you list a number of sources and references, and one
18  is ASIS International; right?
19      A.    Yeah.  But to be clear, I didn't reference
20  them.  The forensic methodology references ASIS.
21      Q.    Right.  So forensic methodology, the
22  method that you used in here does apply principles
23  within ASIS International; correct?
24      A.    Specifically the general security risk
25  assessment guidelines.

**28**

1      Q.    Okay.
2      A.    It references one of them.
3      Q.    Just one of them.  So you don't like the
4  rest of them?
5      A.    I didn't say that.  I'm just -- I'm giving
6  you factually what is referenced.  It's one ASIS
7  reference that is called out in the forensic
8  methodology.
9      Q.    Okay.  Are you a member of ASIS?
10      A.    Yes.
11      Q.    Okay.  And ASIS publishes guidelines as it
12  relates to security; right?
13      A.    Guidelines and standards.
14      Q.    Okay.  And tell me the difference between
15  a guideline and a standard in your mind.
16      A.    So in simplistic terms, both of them
17  require voluntary adoption.  The difference between
18  the two is the guideline says you should do
19  something.  The standard says you shall do something.
20  That's a simplistic way to say it.
21            The standards for ASIS also go through a
22  little bit more of a rigorous process through ANSI,
23  the American National Standards Institute.  So they
24  follow distinct protocol.
25      Q.    Okay.  So guidelines are should and

**29**

1  standards are shall?
2      A.    Plus a little bit more rigorous approach
3  to the standards.  But, again, both of them require
4  voluntary adoption by an entity in order to be held
5  accountable to them.
6      Q.    Explain that to me, "voluntary adoption to
7  be held accountable to them."  Are you talking about
8  a certain business or something like that has to
9  adopt these standards?
10      A.    Yeah.  You can't just be accountable to it
11  just because they exist.  I mean, the mere fact that
12  ASIS publishes a guideline or a standard does not
13  mean that it's, therefore, applicable to a business.
14            The business has to go, hey, that's a good
15  standard.  We're going to adopt that.  So they have
16  to voluntarily adopt it before they can be -- before
17  they have to meet the terms of the standard of the
18  guideline.
19      Q.    Okay.  So with that explanation, a
20  business can say, hey, listen, I don't like these
21  ASIS standards.  And so your opinion is then they
22  can't be held to them because they never adopted
23  them; is that correct?
24      A.    Well, that's just a fact.  That's not my
25  opinion.  It's just a fact.  I mean, I think even at

**30**

1  the beginning of every standard, it says it requires
2  voluntary adoption, or some language that's similar.
3  My term is voluntary adoption.
4      Q.    Voluntary adoption.  Okay.  So there's
5  standards out there that say shall, but it's still
6  voluntary whether or not a company wants you just to
7  implement them or abide by them; correct?
8      A.    It's always voluntary unless it's an
9  ordinance or a law or a regulation or part of some
10  accreditation.
11            So none of the ASIS standards, you know,
12  just broadly apply to different businesses.  The
13  business has to make a decision that they want to
14  adopt them.
15      Q.    I gotcha.  Do you use those -- in any of
16  your opinions that you've ever given in any case or
17  let's say litigation context, do you fault companies
18  or entities for failing to voluntarily adopt these
19  standards?
20      A.    Do I fault companies for failing to
21  voluntarily adopt these standards?  Not necessarily,
22  not necessarily an ASIS standard.  But, you know,
23  your question earlier about criminal background
24  checks, for example, there is some guidance on
25  criminal background checks in one of the ASIS

31

1  documents.
2         So I can't think of an instance where this
3  has happened, but I can certainly -- you know, if I
4  was working on a case that they had some, you know,
5  loosey-goosey approach to criminal background
6  investigations, I may be critical that they failed to
7  adopt a protocol that made sense.  But I wouldn't
8  necessarily say they failed to meet the ASIS standard
9  because, again, the ASIS standard's voluntary.
10  Q.    It seems like every one of these things,
11  these standards are all voluntary.  Is that -- just
12  to try to end this thing, I mean, it's your opinion
13  that all these standards, ASIS and any of the other,
14  you know, standards or guidelines published by other
15  entities, they're all voluntary for private
16  companies; is that right?
17  A.    Well, it's not an opinion.  That's just a
18  fact.  I mean, they're voluntary.  They don't become
19  law because an organization publishes them.
20  Q.    Right.
21  A.    They're not -- they're all voluntary.
22  Q.    Okay.  No, I'm just wondering.  I mean,
23  you know, you're using -- as lawyers, we use the word
24  "should" and "shall" a lot differently when we're
25  interpreting statutes.  And so I'm just trying to

GILBERT & JONES

32

1  understand what you mean, you know, when you earlier
2  said these are "should" and then you "shall" adopt
3  those.
4         "Shall" to me as a lawyer, and Ms. O'Hearn
5  can probably agree to that when we're looking at
6  statutes, means that this has to be implemented.  But
7  you've made a distinction between laws that states or
8  the government has made as those being required.  But
9  the standard, even though they shall be adopted, in
10  your opinion, are still voluntary; is that correct?
11  MS. O'HEARN:  Object to the form of the
12  question.
13  A.    The distinction, the distinction between
14  what you're saying and what I'm saying is you're
15  talking about laws.
16  Q.    (By Mr. Shipley)  Right.
17  A.    And I'm thinking about something in
18  private organization, a private for-profit
19  organization is writing, not state laws or city
20  ordinances.  So that's the real distinction between
21  your way of thinking about it and what I'm saying.
22  Q.    I gotcha.  So there's a lot of
23  subjectivity between security consultants.  They're
24  going to all -- many can arrive at different opinions
25  which guidelines or standards should have been

GILBERT & JONES

33

1  implemented by a business or should not have been
2  implemented; is that correct?
3  A.    So I think there would be -- I mean, in
4  some instances there's regulatory requirements.  In
5  some instances, there's accreditation requirements.
6  When we're talking about specifically, as in this
7  case, a grocery store, there is no accreditation.
8  There is no, at least on the security side, there's
9  no regulation.  I'm sure there's food safety
10  regulations, but that's not what we're talking about
11  today.
12         So there is no -- there's nothing that
13  would require Kroger to adopt or implement or even
14  belong to ASIS or any other security association.
15  Q.    They're helpful, in your opinion, in
16  developing proper security protocols.  Is that what
17  you're saying?
18  A.    Well, they can be.  It depends on, you
19  know, what industry you're talking about.  I don't
20  find the ASIS standards or guidelines to be
21  particularly informative in the healthcare field.
22         Kroger, I don't know how many -- I don't
23  know how many of their employees are ASIS members,
24  but I would suspect, and I think what Scotlon told me
25  was that he was a member -- he was not a member of

GILBERT & JONES

34

1  ASIS.  He was a member of like the Food Marketing
2  Institute and those more retail-oriented type of
3  associations, which makes more sense.
4  Q.    What's called, the Food Marketing Group is
5  what Scotlon said?
6  A.    I think he said, if I'm not mistaken, that
7  they were not a member of ASIS.  That he was a member
8  of like Loss Prevention Foundation and FMI, Food
9  Marketing Institute.  And then I think he had some
10  kind of safety designation as well, certification.
11  Q.    Food Marketing Group, I mean, do you have
12  any idea -- and you may not.  I'm just wondering like
13  what topics or guidelines did they provide?
14  A.    I don't know off the top of my head.  I
15  know they have some.  They have a security entity or
16  security committee or something within that
17  organization, but I'm not familiar with it.  I used
18  to be a lot more familiar with LP Foundation, Loss
19  Prevention Foundation earlier in my career, but I'm
20  less so nowadays.
21         But those organizations are typically the
22  organizations that grocery stores, in general, belong
23  to.  You know, ASIS is kind of like a catch-all for
24  everyone.  So could Kroger be a member?  Sure.  Could
25  individual Kroger employees be a member?  Sure.

GILBERT & JONES

**43**

1 And then practice, there's something
2 called practice requirements. So they have active
3 members, associate members and internal consultant
4 members. So the -- I'm an active member. An
5 internal consultant member would be something like
6 the CSO, chief security officer for Sony, for
7 example. And then an associate member, I don't know
8 what that is.
9 Q. How would the chief security officer at
10 Sony -- I'm just confused. I mean, he's obviously
11 not independent; right?
12 A. He can be independent, sure.
13 Q. If he's working for Sony, though, I mean,
14 how is that independent?
15 A. Because he's not working for a guard
16 company or for a camera manufacturer. Well, I guess,
17 that's a bad example. Sony does make cameras.
18 Security cameras, I should say.
19 So, and then I'm bringing up Sony because
20 one of our members was the former CSO for Sony
21 Electronics. He was an internal consultant member
22 where he advised his client, which is Sony
23 leadership, C suite people, on how to better, you
24 know, implement security.
25 Q. Gotcha. And do you pay a fee to be a
GILBERT & JONES

**44**

1 member of this group?
2 A. Absolutely.
3 Q. Okay. Do you pay a fee to be a member of
4 ASIS?
5 A. Yes.
6 Q. Okay. You've got a lot of publications
7 listed on your CV other than the three books we
8 discussed. Where are these publications? Are they
9 on your Web site? Who are you writing things for?
10 A. Well, they're all referenced in there as
11 to where they're published. I mean, the vast
12 majority of them are published -- I mean, let me be
13 clear. A lot of them are published in journals. I
14 think two or three of them may have been published
15 only on my Web site. Some of them are published in
16 *Security Management Magazine*, which is ASIS's
17 magazine. Some of them are published in the IAPSC's
18 newsletter. I mean, they're published all over the
19 place. Some of them are book chapters. Some of them
20 are forewords to other people's books. Some of them
21 are published on, you know, Department of Justice's
22 POP Center Web site. They're published all over the
23 place.
24 Q. Okay. I just didn't know. Three books.
25 I got mine on Amazon. Is that where you sell these
GILBERT & JONES

**45**

1 books?
2 A. I mean, Amazon is certainly one place.
3 Where the books -- *Applied Crime Analysis* and
4 *Strategic Security Management* are sold by the
5 publishers. So wherever they sell the books at,
6 which do include Amazon as well as their own Web
7 sites as well as Barnes & Noble, etcetera.
8 *Unraveled*, I self-published that one
9 because I wanted more control over it. And that one
10 you can buy, I think, pretty much everywhere.
11 Q. In book stores?
12 A. Do you count Barnes & Noble and Amazon as
13 a book store? Yes.
14 Q. Yeah. I'm just curious where they're
15 selling.
16 A. Yeah. I mean, they're sold wherever books
17 are sold. I don't, I mean, I don't have a full list
18 of where they're sold.
19 Q. Okay. Do you know how many copies of
20 *Unraveled* have been sold?
21 A. I don't.
22 Q. So let's just talk about TAG. We know it
23 started in '97; is that right?
24 A. Mar 12th, '97.
25 Q. Mar 12th. And that's based in Sugar Land,
GILBERT & JONES

**46**

1 Texas?
2 A. That's where the P.O. Box was, and that's
3 where the -- where my office was originally, yes.
4 Q. Okay. I haven't been out there since the
5 sugar refinery blew up. So do you live in Sugar
6 Land?
7 A. I live right outside the city limits of
8 the county.
9 Q. Okay. Is your business, is it a home
10 office or does it have a brick-and-mortar location?
11 A. No, sir. Home office.
12 Q. Okay. Tell me who you are, you know, I guess
13 who are some of your clients other than law firms.
14 A. So I have confidentiality with most of my
15 clients. I'm not going to be able to disclose that,
16 but I can tell you broad categories. It includes
17 retailers and grocery stores and shopping centers and
18 apartments and property management companies.
19 You know, there's some clients I can
20 certainly mention. You know, I do a lot of work for
21 hospitals because they're very complex environments
22 that have retail but have pharmaceuticals, that have,
23 you know, patient care, that have, you know, think
24 about -- you know, most people don't think about a
25 hospital campus, you know, in terms of what it
GILBERT & JONES

**51**

1  violence assessments, security risk assessments.  I
2  mean, there's a myriad of things under the security
3  umbrella that I can handle.
4      Q.    Okay.  And thank you for that.  Two
5  different things.  You said there's vulnerability
6  assessments and then there's also threat assessments,
7  which combined allow you to perform a risk
8  assessment; is that correct?
9      A.    Yes.
10     Q.    What is the difference between the
11 vulnerability assessments versus the threat
12 assessments?
13     A.    So a threat assessment is looking at what
14 has happened or what could happen.  A vulnerability
15 assessment is looking at every opportunity regardless
16 of whether there is a threat associated with it.
17         And then a risk assessment is the better
18 approach, which is looking at, you know, the threats
19 and the vulnerabilities and what we're trying to
20 protect in conjunction.  So looking at those
21 collectively is when you're really looking at your
22 risks.
23         And the best example I can give you is,
24 you know, I live outside Houston.  Houston's, you
25 know, recognized as a pretty dangerous city.  I

GILBERT & JONES

**52**

1  wouldn't sleep with my window open at night because
2  there's lots of threats.  Not necessarily where I
3  live but in the area.  Okay?
4      Q.    Okay.
5      A.    So I wouldn't sleep with my window open.
6  That would be a vulnerability.  I have the
7  commensurate threat in the area.
8          But if I lived in Bozeman, Montana -- I
9  don't know if you've been to Bozeman.  It's a lovely
10 place -- you know, I would keep my window open even
11 though the vulnerability exists.  The threat's not
12 there, so the risk is not there.
13     Q.    Okay.  And I just read up a little bit on,
14 you know, some of your books and in other
15 publications.  Would that be more considered -- what
16 you just described there when you combine the
17 vulnerability assessments for the threat assessments,
18 is that more of the totality of the circumstances
19 approach?
20     A.    No.  That's a legal term.  I mean, that's
21 not -- you know, that's not -- that's -- there are
22 two -- we're operating two different worlds here.
23 You're talking about the legal concept and I'm
24 talking about the way things are done in the security
25 industry.

GILBERT & JONES

**53**

1          A security risk assessment takes into
2  consideration assets, what you're trying to protect,
3  threats, what you're protecting against, the existing
4  security measures that are in place to protect those
5  assets, and then the vulnerabilities that still
6  exist.  That gives you your risk assessment.
7          So totality of the circumstances is, my
8  lay understanding, is a concept in law where you can
9  look at kind of all hazards as opposed to only
10 looking at prior similar crimes when trying to
11 evaluate foreseeability.
12     Q.    Okay.  So you just said the totality of
13 the circumstances, that terminology is just legal?
14     A.    It's a term of art in your field.  It's
15 not a term of art that we use in our field.
16     Q.    Okay.
17     A.    At least my understanding of totality of
18 the circumstances.  I don't know what you're
19 referencing.
20     Q.    Yeah.  No.  I'm just curious.  I've read
21 about it in a number of these books.  I believe one
22 of your co-authors or one that you wrote a chapter in
23 the book, Norman Bates, he's a proponent of the
24 totality of the circumstances method; is that right?
25     A.    Well, Norm's an attorney.  So I'm guessing

GILBERT & JONES

**54**

1  that Norm wrote about the legal concepts.  That's why
2  I asked him to write a chapter in, you know, both
3  editions of *Strategic Security Management*.
4      Q.    Right.
5      A.    It's from a legal perspective.
6      Q.    Yeah.  And I think that's in Chapter 13
7  where Mr. Bates says:  "The major problems with prior
8  similar crime rules is the lack of clear direction on
9  what constitutes similar."  Do you agree with that?
10     A.    Okay.  So, I mean, I'm trying to make sure
11 you're understanding what I'm saying.  Norm's an
12 attorney.  So he's writing specifically on
13 foreseeability.  He's not talking about security risk
14 assessments.
15     Q.    Okay.  It's just in your book.  I mean, it
16 says he thinks the major problems of the prior
17 similar crime rule is the lack of clear direction on
18 what constitutes similar.
19         He says, "The legal effect of the prior
20 similar crime rule is to take black-and-white
21 position on the issue that either there was a risk of
22 certain type of crime or not.  However, the risk of
23 crime is not black and white.
24         "The more contemporary approach to
25 analyzing foreseeability is the totality of the

GILBERT & JONES

1  circumstances rule. Under this rule, evidence is
2  typically allowed to show the existence of prior
3  dissimilar crime, crime in the neighborhood and other
4  factors to determine whether a crime is foreseeable.
5  By using the totality of the circumstances approach
6  to evaluate the level of risks, owners and managers
7  will be able to assess the risk of crime at their
8  properties than if they restricted their analysis to
9  only prior crimes."
10         You don't agree with that approach?
11         MS. O'HEARN: Objection to form.
12     A.    Well, yeah. That's got nothing to do with
13  risk assessments. He's talking about this is what
14  the legal requirements are. And he's, obviously,
15  he's not talking about Georgia, which is even, you
16  know, tighter, I would say, based on my lay
17  perspective of the law in Georgia. So he's clearly
18  not talking about Georgia. He's talking about if
19  there are these two concepts, then this is the
20  differences between them.
21         None of it matters if we're talking about
22  Georgia law. And certainly none of it is addressing
23  security risk assessments.
24     Q.    Right. And I think -- and I know that. I
25  agree. I know Georgia law on this. And me and

1  Ms. O'Hearn know exactly what the courts analyze when
2  they're looking to see if there was -- if a certain
3  crime was reasonably foreseeable. And it is, in
4  fact, as far as my understanding goes, looked at
5  prior similar crimes.
6         I'm just saying Mr. Bates says that a
7  better method is the totality of the circumstances.
8  And since you included it in your book, I just
9  wondered if you had any preference over the method
10  used. Not in the legal context. I'm talking
11  about --
12     A.    Yeah.
13     Q.    -- making a facility safe.
14         MS. O'HEARN: Object to the form before
15     you answer, but go ahead.
16     A.    I think I understand your question. I
17  mean, No. 1, it's not my place to judge the law in a
18  particular state.
19     Q.    (By Mr. Shipley) I agree with that.
20     A.    No. 2, I would say that in the private
21  sector, what we engage in is called problem
22  identification. Okay? So we would look at the
23  specifics of what has occurred on the property to
24  identify whether we have reasonable security measures
25  in place to prevent further acts of a similar nature.

1  Okay?
2         And then we would also look at what does
3  the scientific literature say about the efficacy of
4  certain security measures.
5         So I'll give you an example. We'll just
6  cut to the chase here. The incident behind the
7  Goodwill or people getting in arguments about the
8  parking lot would not instruct me in any way, shape
9  or form to redesign the bathroom inside the Kroger
10  store.
11     Q.    Okay. So we're getting into this. The
12  parking lot, you know, is owned by Kroger; correct?
13         MS. O'HEARN: Object to the form.
14     A.    I'm sorry. Your question --
15     Q.    (By Mr. Shipley) The majority of that
16  parking lot in the Berwick Shopping Center is owned
17  by Kroger?
18     A.    I don't know --
19         MS. O'HEARN: Object to the form.
20         THE COURT REPORTER: I'm sorry. You're
21  talking over each other so I can't hear. I
22  didn't hear what you said, Mr. Vellani.
23         MR. SHIPLEY: Me?
24         THE COURT REPORTER: No. Mr. Vellani.
25     A.    I don't know the ownership or operations

1  of the parking lot. That wasn't relevant in this
2  case.
3     Q.    (By Mr. Shipley) So the only thing, and
4  we'll get into that later, but the only thing you're
5  looking at is any crime that's ever occurred within
6  the bathroom; is that right?
7     A.    No. No.
8     Q.    That's it. Just bathroom crimes?
9     A.    No. You are putting words in my mouth.
10     Q.    No. Is that what you're looking at?
11     A.    Yeah. And now you're asking me a
12  question? The answer is no, that is not what I
13  looked at. I looked at the totality of where the
14  threats are occurring at the Kroger store and what
15  the nature of those threats were.
16     Q.    Okay.
17     A.    There was nothing -- what I'm saying is
18  there was nothing instructive in any of the crime
19  data or any of the internal reporting or any of the
20  security matrix that would inform me that there was a
21  problem in the bathroom.
22     Q.    By looking at the totality of the crimes
23  that occurred there prior to Ms. Enzor's kidnapping,
24  rape and battery.
25     A.    I'm sorry. Is that a question or a

**63**

1  problem in the bathroom.
2      Q.    Okay.  I gotcha.  So that is your opinion.
3      A.    Yes.
4      Q.    Let's talk about -- we talked about some
5  of your clients, your undisclosed clients.
6          Expert services you provide in litigation.
7  You provided a list of cases, and I appreciate that,
8  over the last four years.  And it appears I counted
9  about 35 cases; is that right?
10      A.    I have no idea.  I haven't counted them.
11      Q.    Okay.  Well, I'll represent to you that I
12  counted 35.  If I'm wrong, 34 or 36, then it's my
13  fault.
14      A.    I'll take your word for it.
15      Q.    Does that sound about right, though, about
16  35 cases you either provided testimony at trial or
17  depositions?
18      A.    Yeah, it sounds about right.
19      Q.    Okay.  And that's about nine cases a year;
20  right?
21      A.    Yes.
22      Q.    Okay.  And what's your current case load
23  right now as far as how many -- how many cases are
24  you providing expert opinions in, specifically in a
25  litigation context?

GILBERT & JONES

**64**

1      A.    I don't know the number.  I mean,
2  they're -- they're different -- I'm a unique expert
3  in that I don't necessarily take on the entire case.
4  Sometimes I'm brought on as an expert only in the
5  crime risk stuff, and I'm not asked to opine on the
6  security measures because that's what I'm known in
7  the industry as the guy that understands how to
8  analyze crime.
9      So other experts will bring me in either
10  directly working for them or they'll refer me to
11  their attorney.  So then the attorney engages me just
12  on that one element.  So I don't have a great number
13  for you.  But probably active cases?  Maybe 20.
14      Q.    Twenty cases right now?
15      A.    Yeah.  Doing the full-blown thing, yeah.
16      Q.    Okay.  You're not from Georgia or anything
17  like that, are you?
18      A.    No, sir.
19      Q.    Okay.  Do you have any ties to Georgia?
20      A.    I do a lot of work in Georgia.
21      Q.    Okay.  Yeah.  Yeah.  I know.  And I think,
22  you know, I read a prior deposition of yours.  And
23  you agreed that you have testified over a dozen times
24  in the state of Georgia in cases alone; is that
25  correct?

GILBERT & JONES

**65**

1      A.    I'm sure that's true, yeah.
2      Q.    Is it two dozen?  I think that was the
3  next thing you say it could have been.
4      A.    I don't know.  Again, you've got the Rule
5  26.  I don't -- it tells you what state it's in.  I
6  don't know the answer.
7      Q.    So many times you don't know.  I gotcha.
8  And --
9      MS. O'HEARN:  Object to the form.
10      Q.    (By Mr. Shipley)  And one of the
11  depositions you also testified in 2018, I believe,
12  that 70 percent of your cases that you testified in
13  was for defendants and about 30 percent for
14  plaintiffs, is that correct, as of that date in 2018?
15      A.    Testified for?
16      Q.    Or provided any kind of testimony in a
17  litigation context.
18      A.    Well, that's what I'm saying.  If we're --
19  there's several different things here; right?
20  There's retentions.  There's testimony.  There's
21  trial.  So it depends on where you're, you know,
22  where that metric is you're looking for.  If you're
23  looking for testimony, that number's probably correct
24  back in 2018.
25      Q.    Okay.  Okay.  What is it now, do you

GILBERT & JONES

**66**

1  think?  What do you think your percentage for
2  providing, let's say, retention for plaintiff versus
3  retention for defendants?
4      A.    Retentions are probably 30 percent still.
5  Testimony's far more heavy on the defense.  And
6  that's primarily because of Georgia where there's no
7  report requirement, except in federal court.  So most
8  of the time, you know, I've got to do a deposition as
9  opposed to relying on a report.
10      Q.    Okay.  When you say far more heavier --
11  and you're right.  In the federal courts, there is
12  the report that is, in fact, required.  When you say
13  heavier, is it closer to 90 percent that you provide
14  expert reports for?
15      A.    Not reports.  Depo -- I thought we were
16  talking about testimony.  I'm sorry.
17      Q.    Yeah, I'm talking about testimony.  Let's
18  go back for testimony, is it closer to --
19      A.    Testimony on that Rule 26 is probably a
20  hundred percent for the defense because most of those
21  cases are in Georgia where I don't do a report.
22      Q.    Okay.  Is that the current case load or is
23  that your history over the last five years?
24      A.    No.  I'm saying the Rule 26, which would
25  reflect testimony only over the last four years.

GILBERT & JONES

**67**

1  Q.   And it's a hundred percent for defense?
2  A.   I don't think there's a plaintiff case
3  left on there.
4  Q.   Okay. Do you know if you've ever had your
5  testimony excluded by a judge?
6  A.   Not to my knowledge.
7  Q.   Okay. Have you had it excluded at trial?
8  A.   I thought that was the same question.
9  Q.   No. Did the judge allow you to testify
10 and then excluded some of your testimony during the
11 course of the trial?
12 A.   I'm not sure I quite understand. Every
13 trial that I've been asked to testify in, I
14 testified.
15 Q.   Okay. Has the judge ever instructed the
16 jury to disregard your testimony?
17 A.   Like as I gave it in realtime?
18 Q.   Yes.
19 A.   I don't know the answer to that. I don't
20 think so. You know, you're up on the stand. You're
21 not paying attention to everything that's happening
22 kind of, you know, around you. You're kind of
23 focused on what you're doing. So I don't know the
24 answer to that.
25 Q.   Okay. I'd say in two thousand and -- so

**68**

1  far this year, what percentage of your income comes
2  from providing expert services in a legal --
3  litigation context versus a consulting context?
4  A.   I don't -- that's not information that I
5  track. So I can't answer it. But what I can tell
6  you is that I'm pulling my hair out with the amount
7  of consulting projects I've got nonlitigation. So
8  the vast majority of my time and income would be
9  driven by consulting work.
10 Q.   Time. I'm talking about dollars you
11 receive. Is that more?
12 A.   I don't know. It's not something I track.
13 Q.   You don't know?
14 A.   That is not something I track.
15 Q.   Okay. Talking about Kroger, have you ever
16 served as an expert witness for Kroger in a
17 litigation?
18 A.   Yes.
19 Q.   How many times?
20 A.   Where I gave testimony?
21 Q.   Yeah.
22 A.   I can only think of -- I don't know. I
23 don't know. There was -- there was a case where I'm
24 named in the security company at a Kroger store. I
25 gave testimony for Kroger in one case, one case that

**69**

1  I can think of, but I'm sure there's more. I don't
2  know off the top of my head.
3  Q.   Okay. Was that the Taylor versus Kroger
4  case that was in DeKalb County that involved
5  Pete Law?
6  A.   Which case was that? Tell me, do you know
7  the facts of it?
8  Q.   You know, it's 2018 and it involved a very
9  serious injury that occurred at a Kroger. I think
10 John Villines was also an expert for the plaintiff,
11 and you were a rebuttal witness to Mr. Villines.
12 A.   I mean, do you know the nature of the
13 crime? That might help me. I don't know the
14 plaintiff's name. I apologize.
15 Q.   Okay. No, that's fine. If you don't
16 remember it, that's fine.
17 During that case, do you remember speaking
18 to Mr. Scotlon Hughes at all?
19 A.   I've talked -- I've spoken with Scotlon
20 twice, once for this case and once for the other
21 case. I don't remember what that other case was. It
22 was not in Savannah. It was definitely in Atlanta.
23 But I don't know if I testified in that case.
24 Q.   Did it have to do with some lighting
25 issues? Does that help?

**70**

1  A.   No. If you tell me the nature of the
2  crime, I'd probably remember it. That would -- that
3  would be what would stick in my mind.
4  Q.   You said that how many times have I given
5  testimony for Kroger. Have you been retained by
6  Kroger where you have not delivered testimony?
7  Additional times?
8  A.   Yes.
9  Q.   How many times?
10 A.   I can think of at least one other case
11 where I've not yet been disclosed in Texas.
12 Q.   Okay. Is that case currently ongoing?
13 A.   Yes, sir.
14 Q.   Okay. Do you know the facts of that case?
15 A.   It was a violent crime in the parking lot.
16 Q.   Okay.
17 A.   And, again, I'm saying that it's for
18 Kroger. It may be for the shopping center owner. I
19 don't know exactly. I know that, you know, a
20 Kroger's at issue there.
21 Q.   Kroger's within the shopping center?
22 A.   Correct.
23 Q.   Okay. Do you know what kind of injuries
24 that the plaintiff suffered in the parking lot in
25 Texas?

**71**

1    A.    No.  That case has been dormant for like
2 three years now.  So I don't know.
3    Q.    Okay.  Have you ever performed any
4 other -- other than outside the litigation context,
5 have you ever worked for Kroger in any capacity?
6    A.    Yes.  I've done consulting for them years
7 ago.
8    Q.    What kind of consulting did you do?
9    A.    The crime analysis consulting that was
10 specifically here for Kroger Texas LP.
11    Q.    So was it for a district that encompassed
12 a number of Krogers or was it for -- I would assume
13 it's a district.  Or was it for a specific Kroger in
14 Texas?
15    A.    I've done both.
16    Q.    You've done both?
17    A.    Yes.
18    Q.    Two different cases or two different times
19 in Texas?
20    A.    Well, there were -- those were two
21 different projects.  I mean, there may have been
22 three.  I don't know.  Now that I'm thinking about
23 this.  You're making me go back 20 some odd years.
24 There was a third one that I'm thinking about as
25 well.

**72**

1    So, I mean, bottom line is I do not
2 currently do any consulting work for Kroger.  I have
3 in the past.
4    Q.    Okay.  Have you ever done any consulting
5 work for any Krogers that are located within Georgia
6 or South Carolina?
7    A.    I've done a unpaid pilot project for the
8 Atlanta -- the stores in the city of Atlanta for the
9 general office.
10    Q.    Did you work with Mr. Hughes on that?
11    A.    No, sir.
12    Q.    Did you work with Mr. Sheehan?
13    A.    No, sir.  I worked in the general office.
14    Q.    The general office.  And what kind of
15 services -- tell me again, just describe what kind of
16 work did you do for Kroger here in the Atlanta area?
17    A.    It was a pilot program, again, and not
18 paid.  So if you go back to the *Strategic Security*
19 *Management* --
20    Q.    Uh-huh.
21    A.    -- there is a -- oh, man, my brain.  This
22 is going to be embarrassing.  I'm not going to
23 remember this guy's name.  One of the chapters is
24 written by a guy who used to be with Randalls grocery
25 stores, which is now owned by Safeway.

**73**

1    Q.    Right.
2    A.    He became, you know, whatever the title
3 is, the top dog at the GO for asset protection.  So I
4 did -- I knew him from here and did a little bit of
5 consulting for him when he went to Kroger.  When he
6 went to the GO specifically.
7    Q.    Okay.  Do you remember -- and you can give
8 me an estimate -- like how many years ago was it that
9 you were last hired by Kroger in any market, any
10 district across the country to provide just
11 consulting services?
12    A.    I mean, it's been over five years.  I
13 don't know anything --
14    Q.    Okay.
15    A.    -- beyond that.  I don't think there's
16 anything in the last five years.
17    Q.    Okay.
18    MR. SHIPLEY:  I think we're at a good
19 stopping point.  We've been going about an hour
20 and a half.  Do you want to take about a, I
21 don't know, about a 10-minute break and come
22 back?  Or five minutes is fine, too.
23    MS. O'HEARN:  That's fine.
24    THE WITNESS:  I'll be back in five.
25    MR. SHIPLEY:  Okay.

**74**

1    (Recess from 11:25 a.m. to 11:32 a.m.)
2    Q.    (By Mr. Shipley)  Okay.  I want to move
3 forward and talk about I think we agreed would be
4 Exhibit 3, which is your, just your retention
5 contract.  Just I just have a couple questions on
6 that.
7    It appears you're charging Ms. O'Hearn's
8 firm $500 an hour for any work; is that right?
9    A.    Yes, sir.
10    Q.    Are you charging me the same price today?
11    A.    Yes, sir.
12    Q.    Okay.  And that's for deposition
13 preparation and testimony and all that?
14    A.    Yes, sir.
15    Q.    Okay.  And I think it said in there you
16 charged a 5,000 nonrefundable retainer from which you
17 draw from; is that right?
18    A.    Yes, sir.
19    Q.    Okay.  And I've got in my possession --
20 and I think this is right -- three different bills.
21 I think that's the totality of them.  The first bill
22 is September 11 of '22.  It was $1800.  A portion of
23 that was for ordering crime records; is that right?
24    A.    Yes.
25    Q.    Did you order those crime records directly

79

1  internal security procedures before in at least one
2  other case; right?
3      A.    What do you mean by "internal procedures"?
4      Q.    Well, on how they determine, you know, the
5  risk security assessment and things like that.
6      A.    Yeah.  Yes.  I've dealt with that before.
7      Q.    Yeah.  And all I'm talking about is like
8  you had seen like, you know, the Crimecast reports,
9  the LPMS reports, things like that?
10     A.    Yes.
11     Q.    Okay.  So you had some familiarity with
12  how -- of what Kroger uses to determine a risk, a
13  risk score for each store?
14     A.    It's hard to say.  I have seen that a lot.
15  But, yes.  Risk score for each store, that's right.
16     Q.    It seems like that's what they call it.
17     A.    It's a tongue twister.  No.  I love when
18  my clients refer to it as such.  It's always tongue
19  twister.
20     Q.    This is for me, too.
21           Okay.  Did you provide him with any
22  documents or anything like that?
23     A.    No.
24     Q.    Okay.  Again, you live out in Texas.  I
25  see no travel expenses on the invoices.  Have you

80

1  traveled at all to the state of Georgia for this
2  case?
3      A.    Not for this case, no.
4      Q.    So safe to say you've never been to the
5  Berwick Kroger in Savannah, Georgia?
6      A.    Correct.
7      Q.    Okay.  And you've never laid eyes on the
8  bathroom as it existed, for the condition that
9  existed at the time of Ms. Enzor's incident?
10     A.    No, sir.
11     Q.    Okay.  And you haven't seen the bathroom
12  since it's been altered in any way?
13     A.    No, sir.
14     Q.    Okay.  Did you interview any other Kroger
15  employees other than Mr. Hughes?
16     A.    No, sir.
17     Q.    Okay.  Did you attempt to interview the
18  manager, I believe it was a Mr. Edwards who was
19  managing the Kroger on April 27th of '21?
20     A.    No.  I didn't try to speak to Tim Edwards.
21     Q.    Okay.  Had you ever spoken to Tim Edwards
22  before?
23     A.    No, sir.
24     Q.    Okay.  And we took some depositions last
25  week.  Apparently Mr. Edwards left Kroger

81

1  approximately, according to the deposition, or to the
2  deponent, about a week after this incident.  Are you
3  aware of that?
4      A.    I was not.
5      Q.    Okay.  So you have no idea why Mr. Edwards
6  left Kroger store 645 after the incident?
7      A.    No, sir.
8      Q.    Okay.  All right.  I want to ask you about
9  what we've marked as Plaintiff's Exhibit 5.  Now your
10  -- we'll call it your expert report.  We've already.
11  I think there's a -- let me turn to it.  There's a
12  section in the beginning about qualifications.  I
13  think we've beat that horse.
14           Let's kind of jump into it.  And I just
15  want in the beginning here just talk about lists.
16  Have you got it in front of you there --
17     A.    I do.
18     Q.    -- Mr. Vellani?  That's fine.  Materials
19  received is page 4.
20     A.    Yes, sir.
21     Q.    Okay.  You've seen -- it appears that
22  you've gotten the Chatham County police report as
23  well as the Kroger internal incident report for the
24  4 -- I'm just going to call it the subject incident;
25  is that correct?

82

1      A.    Yes.
2      Q.    Okay.  And during that police report, you
3  see Mr. Hathorne, Gregory Hathorne was charged with
4  kidnapping, rape and battery.  Is that your
5  understanding?
6      A.    I believe so, yes.
7      Q.    Okay.  You would agree with me that
8  Chatham County police report is much more detailed
9  than the Kroger report, isn't it?
10     A.    I didn't look at both of them side-by-side
11  to make that comparison.  I'm happy to do it now if
12  you'd like.
13     Q.    Sure.
14     A.    Bear with me one second.  Let me see if I
15  can dig these out of the files.
16           On the Kroger one, we're talking about the
17  one that says Incident Report with the Kroger logo on
18  it?
19     Q.    Yeah.  That's what I'm referring to.
20     A.    Okay.
21     Q.    I don't know.
22     A.    Well, I mean, I don't know what you want
23  me to say here.  The Kroger one -- the Chatham County
24  one is two pages.  The Kroger one is eight pages.
25  The type of information that the police are trying to

**83**

1   obtain would help with their investigation, criminal
2   version.
3           And then, obviously, Kroger's is, you
4   know, more oriented towards a claim. I don't know
5   that one is better than the other or collects more
6   information than the other or more detail, I think
7   was the word you used.
8       Q.    Yeah.
9       A.    The narrative is more detailed in the
10  police report, for sure.
11      Q.    Okay. Okay. And one of the documents you
12  also stated you've looked at are certain manuals that
13  Kroger offers and provides; is that right?
14      A.    Yes, sir.
15      Q.    And one being the Kroger Loss Prevention
16  Manual. You've reviewed that?
17      A.    Bear with me. I don't want to misspeak.
18  Give me one second.
19      Q.    Yeah. I know.
20      A.    Well, the one I'm looking at right now is
21  called the Asset Protection Manual -- Asset Reference
22  Manual -- Asset Protection Reference Manual, excuse
23  me.
24      Q.    I'm talking about No. 10 on page 4,
25  Kroger's Loss Prevention Manual.

GILBERT & JONES

**84**

1       A.    Manual. I'm flipping around too much
2   here. So I must have a document that's referred to
3   that somewhere in the file. Bear with me. Yeah. So
4   it's -- yes. So there's several ones. There's a
5   Loss Prevention Manual, an Asset Protection Manual.
6           I think, if I'm not mistaken, from
7   Mr. Hughes's deposition, he referred to the
8   terminology being changed at some point. So I don't
9   know if one -- if these are the same. I guess the
10  Loss Prevention Manual is the older one. They
11  switched terms to Asset Protection.
12      Q.    Okay.
13      A.    I don't know that for certain.
14      Q.    And then there's another one called The
15  Associate Handbook. I believe you've got a copy of
16  that as well; right?
17      A.    Yes, sir.
18      Q.    Okay. Differences between the Kroger Loss
19  Prevention Manual and the Associate Handbook, can you
20  tell me what your understanding is?
21      A.    Sure. So just like any policy that's,
22  you know, when you go into an organization, they've got
23  policies that are written at the, you know, upper
24  levels, but they're directed to specific types of
25  individuals.

GILBERT & JONES

**85**

1           The Asset Protection Manual, which I think
2   was formerly known as the Loss Prevention Manual
3   because they have similar tables of contents, would
4   be oriented to people in that division or that,
5   excuse me, that -- those job titles of asset
6   protection. The employee handbook, the Associate
7   Handbook, would be oriented towards, you know, the
8   masses.
9       Q.    The regular Kroger employees who work in
10  the stores, is that what you mean, the masses?
11      A.    Yeah. Just the line-level employees.
12      Q.    Okay. And the loss prevention or asset
13  protection manager would be manuals that are provided
14  by or maybe they have some input to it to people like
15  Mr. Scotlon Hughes and Mr. Sheehan?
16      A.    Correct. But just to be clear on the
17  Associate Handbook, I need to clarify that. I mean,
18  the Associate Handbook would be to anybody that would
19  be considered an associate; right? So I'm assuming
20  that's anyone other than a manager.
21      Q.    Right. And would you agree that the
22  Associate Handbook really only addresses Kroger
23  employees' behavior?
24      A.    As opposed to whom?
25      Q.    As opposed to talking about general

GILBERT & JONES

**86**

1   security concerns.
2       A.    Well, no. That's not -- I don't
3   understand what you're saying. Because you're saying
4   that it applies to Kroger employees, but then you're
5   talking about crime. So I'm asking as opposed to --
6   maybe I misunderstood your question.
7       Q.    Yeah.
8       A.    It applies to employees as opposed to
9   customers. Is that what you mean?
10      Q.    What I'm talking about, yeah, and I'll try
11  to explain it. From my review of the Associate
12  Handbook Manual, all of the directives in there are
13  directed towards the employee's behavior while on the
14  clock or while working there at Kroger. I may be
15  wrong. I just want to know if that's your
16  understanding of it.
17      A.    Now I understand. It appears that it is
18  generally oriented towards the employee's behavior,
19  yes.
20      Q.    Okay.
21      A.    There may be some exceptions to that, but,
22  I mean, obviously, generally that's what it's talking
23  about.
24      Q.    Fair enough. Fair enough. And I'm going
25  to try to ask it different. The Kroger Loss

GILBERT & JONES

**87**

1   Prevention Manual deals with lots of topics, and that
2   would be, could be third-party crimes, customer
3   crimes, things of that nature; is that correct?
4       A.    I'm sorry, sir.  Could you repeat the
5   question.
6       Q.    Yeah.  So we've talked about a second
7   handbook manual.  Now, the Kroger Loss Prevention or
8   the Asset Protection Manual, which you've testified
9   is given to people that are in that division like
10  Mr. Hughes and Mr. Sheehan.
11           That manual, in fact, deals with potential
12  crimes that can occur within Kroger, whether that be
13  theft, assaults, bomb threats, things like that that
14  could affect customers, employees, anybody?
15      A.    Correct.  But just to be clear, I'm not
16  certain -- if I remember correctly, either from his
17  deposition or from the interview, I thought this was
18  also something that was distributed to the managers.
19  I could be wrong.  I thought that was in the
20  deposition.
21      Q.    Maybe it was distributed to managers.  I'm
22  not certain.  But when I deposed the employees last
23  week, none of them had ever seen a copy of the Loss
24  Prevention Manual or the Asset Protection Manual and
25  have testified that they don't receive a copy of

**88**

1   that.
2       A.    Yeah, I wouldn't doubt that.  I mean,
3   that's -- that would be -- I mean, again, when you
4   develop policy, if the directive is to a certain
5   subset of the employee population, then there would
6   really be no reason for anybody else to receive it.
7       Q.    Why wouldn't they want to get a copy of
8   that?  You've written in your report on page 29 that
9   Kroger employees are the eyes and ears of the store.
10  What does that mean?
11      A.    Well, I mean, at its most basic level, as
12  we would say it today, it's see something, say
13  something.  It doesn't mean you need to take action
14  to do anything, but it's report it to a manager or
15  report it to loss prevention or asset protection.
16           I mean, you wouldn't want -- you wouldn't
17  want -- I mean, organizationally, you have divisions
18  of labor.  So certain people are authorized to do
19  certain things.  Other people are not authorized to
20  do those things.
21           Like, for example, when I work on a bigger
22  consulting project, and we've got several of them
23  going on right now, the consultants that are working
24  with me are not authorized to interface with the
25  client.  That's my job.  So I wouldn't give them

**89**

1   directives on how to interface with the client.
2       Q.    Okay.  You don't think the material
3   contained with the Kroger Loss Prevention Manual
4   would be beneficial to the employees of each
5   individual store on how to recognize and deter crime?
6       A.    Well, it's a department-specific manual.
7   So, no.  I mean, it's like -- you know, it's like
8   when I do work at organizations that have large
9   security forces, there are a set of standard
10  operating procedures that the security department
11  follows and, you know, is documented in writing.  Not
12  every employee needs that information.
13           You know, just like -- just like the deli
14  safety manual, assuming there is one, I hope there is
15  one, you know, that the deli safety manual wouldn't
16  go into loss prevention guys or go to the, you know,
17  store clerks who are ringing customers up.  I mean,
18  it is normal to have manuals or policies that are for
19  specific subsets of employees.
20      Q.    Okay.  Well, those subsets of employees
21  appear to be just Mr. Hughes and Mr. Sheehan and
22  possibly the manager of the store, is that your
23  understanding, that would have a copy of the Kroger
24  Loss Prevention Manual?
25      A.    I thought they had district guys as well

**90**

1   that were below Mr. Hughes at the district level.
2       Q.    I think that's Mr. Sheehan.
3       A.    I thought Sheehan was the division -- my
4   understanding, and I could be completely wrong, I
5   thought Mr. Sheehan was the division asset protection
6   manager, Mr. Hughes was the assistant, and then they
7   had district guys as well.
8       Q.    I'm not sure of the exact setup.  It's
9   somewhat confusing with all the titles that Kroger
10  hands out.  But these are the only two names that
11  have surfaced.  I know that Mr. Hughes is in Atlanta,
12  and he oversees over 180 stores.  Is that your
13  understanding?
14      A.    That Mr. Hughes?
15      Q.    Uh-huh.
16      A.    Yes.
17      Q.    Okay.  And then Mr. Sheehan, my
18  understanding is that he's overseeing a particular
19  district within the state of Georgia, and some of it
20  bleeds into South Carolina, that would contain a
21  number of stores.  Is that your understanding?
22      A.    No.  My understanding -- and, again, you
23  and I may both have this terminology backwards.  My
24  understanding is that Kroger is divided into
25  divisions.  And they've changed the terminology over

**95**

1    So they redeveloped their methodology from
2  the get-go. So I don't know if it was a
3  site-specific decision or a district decision or
4  division decision. If I remember correctly, a lot of
5  that was at a GO level.
6    Q.    Okay.
7    A.    But I don't know any of that for a fact.
8    Q.    Let me see if we can get that guy's name.
9  I'm just going to read to you a few of the guy's
10  chapters. There's not that many of them.
11    A.    It would be the electronic security
12  chapter, if I'm not mistaken. The physical security
13  chapter.
14    Q.    Yeah. Let's see. Is this in the second
15  edition or first?
16    A.    No. He was in the first edition.
17    Q.    I'm not sure if I have him in there in the
18  first edition. You just can't remember his name?
19    A.    Embarrassingly, no.
20    Q.    But it was in the electronic?
21    A.    Electronic?
22    Q.    You said electronic security?
23    A.    Oh, yeah. I'm sorry. Yes. I think so.
24  Let me -- let me -- I'm pulling up a copy of the
25  book. Give me a second.

GILBERT & JONES

**96**

1    Q.    Yeah. That would be great.
2    A.    Karl Langhorst.
3    Q.    Karl Langhorst?
4    A.    Yeah. So at this time that Karl wrote
5  this chapter, he was director of loss prevention for
6  Randalls and Tom Thumb, which ultimately was
7  purchased by Safeway. I think at or around that time
8  he went to the GO at Kroger.
9    Q.    Okay. I appreciate that. Is that
10  L-a-n-g-h-o-r-s-e?
11    A.    S-t.
12    Q.    S-t.
13    A.    Like Langhorst.
14    Q.    Horst. Gotcha. Langhorst.
15  Karl Langhorst. Okay.
16    You know, in your first edition, you do
17  address security guards in there considerably. And I
18  just want to read you something. You say: "The
19  reality in the security management world is that
20  security personnel are rather easy to deploy with the
21  only major obstacle being cost. Once deployed, the
22  withdrawal of the security officer brings
23  consternation angst for the security decisionmaker.
24  While cost was a consideration in deploying security
25  personnel, it is dangerous to withdraw security

GILBERT & JONES

**97**

1  personnel based on cost concerns. This danger will
2  be recognized by security decisionmakers with any
3  amount of seat time in a deposition or trial subject
4  to questioning by an attorney representing a person
5  victimized under the security decisionmaker's
6  property."
7    Do you agree with that statement?
8    A.    Sure. Yeah.
9    Q.    So can you explain to me a little bit
10  more. So if you've got security personnel there and
11  they remove them, what are the negative effects that
12  you see of that, if any?
13    A.    Well, it depends what they were deployed
14  for in the first place. So, you know, I think --
15  again, I want to be cautious here because I know
16  things that, you know, just through my history of
17  knowing Karl and having at least a somewhat friendly
18  relationship with him, you know, that the idea was
19  for Kroger back then was that they had overdeployed.
20  You know, they weren't driving their security
21  decisions based on risk. And I think what he tried
22  to do was realign based on risk.
23    But what I will tell you generally, you
24  know, like, you know, I get calls from my shopping
25  center clients all the time. And they'll go like,

GILBERT & JONES

**98**

1  hey, we've got security here. You know, we're trying
2  to get them to resolve this problem and they're not
3  being effective at it. I'm like, well, yeah, because
4  security officers are generally not effective at that
5  problem. So should, you know, should we take them
6  out?
7    You know, my take is that, you know, if
8  you can solve that problem with technology or
9  policies and procedures or protocols, then, yeah,
10  take them out. You're not driving the decision based
11  on money. You're driving it based on can they solve
12  the problem.
13    And I'll give you a great example of this.
14  Okay? This is an example from will two weeks ago.
15  I'm in Miami. Last week I'm in Miami. I think it
16  was last week. And I made a recommendation to the
17  client that they are using the security officer in
18  the wrong way.
19    They had the security officer trying to
20  monitor five doors. One door's way over here on the
21  left. One door's kind of hidden on the left. One
22  door's straight ahead. One door's over here. One
23  door's completely out of view. So they planted the
24  security officer right there and -- with the hope
25  that he can monitor for people tailgating. You know

GILBERT & JONES

103

1   Okay?
2           So what I would say is this:  That we need
3   to be talking about prevention.  Now, the research on
4   the efficacy of security officers and police officers
5   regarding their ability to prevent violent crimes
6   such as the subject incident clearly indicates that
7   the vast majority of violent crimes are not going to
8   be prevented.  Okay?
9           So if you look at that giant reference
10  document that I sent you, there are a whole bunch of
11  studies listed in there.  I think there's 20 --
12  there's 16 of them, 20 of them, something like that.
13  There's a lot of them that talk about this.
14          And what those studies generally show,
15  what the majority of the studies show is that
16  security and police officers are not effective at
17  reducing violent crime when doing like foot patrols
18  or vehicle patrols of small areas.  Small areas can
19  be a shopping center.  It could be a parking lot.  It
20  could be an intersection.  It could be a street
21  segment.  It could be, you know, a block.
22          But what the study shows is they're not
23  effective at reducing violent crime.  Most of the
24  studies.  A couple of the studies say they are
25  effective.  Some of them say they're effective

GILBERT & JONES

104

1   against some crimes but not other crimes.
2           So bottom line is do I think that, you
3   know, a police officer or a security officer, you
4   know, assigned to the front entrance area would have
5   prevented this crime?  No.  The research wouldn't
6   support that.
7       Q.   Okay.  One thing you just said, though,
8   you said, you know, my expert nor you are qualified
9   to get into the mind of the offender; is that
10  correct?
11      A.   Yeah.  I think he had given some opinions
12  that, you know, he talked about -- I mean, he didn't
13  reference anything -- he didn't reference any
14  science; right?  I mean, all he did was point to
15  guidelines and standards that were not adopted by
16  Kroger.  So you can't hold them accountable to
17  something they didn't adopt or was not a law, was not
18  a regulation.  I mean, they have to adopt something
19  in order to be held accountable to it.
20          But I think somewhere he talked about -- I
21  can't remember exactly where it was, but I think he
22  had talked about something about, you know, this
23  would deter this or had they done this, it wouldn't
24  have happened.  I mean, there's nothing in what he's
25  saying that makes much sense to me.  And that's why I

GILBERT & JONES

105

1   say I didn't get into his qualifications.  I got into
2   his opinions.
3       Q.   Well, you did.  You reference in there
4   about this offender.  You get into his mind.  You
5   say, hey, he didn't wear a mask.  That's clearly
6   getting into his mind frame, isn't it?
7       A.   No, I didn't say that.  What I said -- and
8   this is very simple.  He had an opportunity to
9   conceal his identity.  Okay?  He did two things that,
10  based on observation by anyone, would say that he's
11  not trying to conceal his identity.
12          One, he's got those funky shorts on that
13  were pretty obvious to recognize.  He's got a black
14  shirt on which kind of blends in.  His shorts stood
15  out.  And the fact that he could have concealed his
16  identity and chose not to tells us something.
17          I'm not getting inside his mind.  I'm
18  looking at his behavior.
19      Q.   I disagree with you, but that's your
20  opinion.  But, I mean, you're obviously trying to get
21  inside of his mind and --
22      A.   I'm not trying to.  I'm explicitly telling
23  you I'm not getting inside of his mind.  I'm looking
24  at his actions.  His actions are that he is not
25  concerned about being identified because he had a

GILBERT & JONES

106

1   very simple opportunity to conceal his identity.  He
2   chose not to.
3       Q.   But aren't all of our actions driven by
4   our mind?  I mean, my mind controls every function.
5   My talking right now.  My ability to see.  It's all
6   controlled by my mind.
7       A.   I don't agree with that.  I don't think
8   any doctor would agree with what you just said.
9   People can still live without a functioning mind.  So
10  that's not exactly true from a medical perspective,
11  but that's neither your area of expertise nor mine.
12          Bottom line is this:  I'm not trying to
13  get inside his mind.  I can't sit here and tell you
14  that had you put a security officer at the front
15  entrance, that that would have deterred Mr. Hathorne.
16  Okay?
17          What I'm simply telling you is he made no
18  effort to conceal his identity despite having a two
19  and a half year period where you could legitimately
20  get away with concealing your identity.
21      Q.   Okay.  Okay.  And one other thing you just
22  brought up again.  You keep going back to this.  You
23  say that an entity such as Kroger cannot be held to
24  standards if they don't adopt them.  I just don't get
25  that.  I mean, you're here and you're providing all

GILBERT & JONES

**119**

1 "In light of the crime risk, Kroger 645 had a
2 reasonable security program which consisted of a
3 multi-pronged approach to mitigating risk.
4 Defendants met the applicable standard of care
5 relating to security." That is my singular opinion.
6     Q.    That is your singular opinion. Let me ask
7 you this then: Do you believe that Ka'La Enzor, the
8 crime that occurred to Ka'La Enzor was reasonably
9 foreseeable?
10     A.    So my understanding of Georgia law is I'm
11 not going to give opinions on foreseeability or
12 causation. I give opinions on the standard of care
13 only, and that's what you see reflected in my report.
14     Q.    Okay. So you have no opinions whatsoever
15 in this case on whether or not Ms. Enzor's crime was
16 reasonably foreseeable based on prior --
17     A.    I'm giving you my one opinion.
18     Q.    Okay. Great. Have you ever testified in
19 any case that a crime was reasonably foreseeable?
20     A.    In 52 other jurisdictions, I have that
21 opportunity.
22     Q.    Have you ever done it?
23     A.    Yes.
24     Q.    You have?
25     A.    Of course.

GILBERT & JONES

**120**

1     Q.    Okay. Was that before 2018?
2     A.    I give opinions on foreseeability. And
3 when I say 52 jurisdictions, I'm talking about 49
4 other states, federal court outside Georgia, D.C. and
5 Puerto Rico. I give those opinions historically. I
6 give them today.
7     Q.    I'm asking you before the year 2018, have
8 you ever testified or provided any testimony, whether
9 in court or in depositions, that a crime was
10 reasonably foreseeable?
11     A.    Yes. Today and historically.
12     Q.    Prior to 2018?
13     A.    I'm not, yeah, I'm not sure what the
14 distinction is there, but, yes, I've given that
15 opinion historically.
16     Q.    Okay. No. I'm just asking before 2018.
17     A.    I said "yes" three times.
18     Q.    No, you never -- you said historically.
19     A.    Well, 2018 would be historically.
20     Q.    What about 2019? Okay. Thank you. I don't want to
21 parse words with you, but I'm just asking you. It's
22 a simple yes or no answer. Not historically.
23     A.    The answer is yes for the fourth time.
24     Q.    Okay. Okay. You briefly touched on it, and you gave me your senior

GILBERT & JONES

**121**

1 report, and that's that Kroger did not breach the
2 standard of care; is that correct?
3     A.    Yes.
4     Q.    Okay. Do you think that there's anything
5 that Kroger could have done to prevent Ms. Enzor's
6 kidnapping, battery and rape?
7     A.    Nothing reasonable.
8     Q.    Nothing reasonable? What would be
9 unreasonable, if you have an opinion?
10     A.    Shut down the store.
11     Q.    Shut down the store. Prior to her
12 arrival?
13     A.    Shut down the store period. Close it
14 down.
15     Q.    Shut down not even half the store. That's
16 the only thing that could have prevented this from
17 happening?
18     A.    That's certainly one way to avoid a risk.
19     Q.    Okay. Any others?
20     A.    I don't think it's reasonable to station a
21 security officer, an off-duty police officer in every
22 bathroom across America. So, you know, you could
23 have done that. Would that have prevented it?
24 Possibly. Probably. But that's not reasonable. So
25 there's many things that can be done that are not

GILBERT & JONES

**122**

1 reasonable.
2     Q.    What about like stationing a security
3 guard just within the store?
4     A.    Again, the research wouldn't support the
5 notion that that would be effective. Could you have
6 done it? Sure. Would it have made a difference? I
7 don't think so.
8     Q.    Okay. Let me show you something real
9 quick. I'm going to for the first time do a -- I
10 think we're on Exhibit 6. So let me try to share my
11 screen. Arguably it'll take me a minute. Bear with
12 me. I think once I get it open, it'll be fine, but
13 somehow my computer's slow.
14     Bear with me one second. I unplugged and
15 for some reason it's slow.
16     All right. Can you see that photo?
17     A.    Yes, sir.
18     Q.    Okay. I'll represent to you that this is
19 the Publix out where I live in a place called
20 Whitemarsh Island in Savannah. They have all of
21 their bathrooms in single stalls up front. The cash
22 registers are literally right across the street from
23 them.
24     Do you think that that -- if Kroger had
25 had their restrooms up front, do you think that would

GILBERT & JONES

143

1 crimes that are more recent heavier than I am crimes
2 that are further back in time. And that's arbitrary.
3 You can go, you know, every crime in the
4 last year is worth three points. Every crime two
5 years ago is worth two points. Every time three
6 years ago is worth one point. I mean, it's
7 arbitrary, but the point is you want to apply a
8 recency test.
9 But, yes, can you go back five years?
10 Yes.
11 Q. Okay. Moving on, proximity. That, I
12 believe, is the fourth factor that we're looking at
13 under, I think what you had deemed it was a
14 quantitative analysis?
15 A. Yes, sir.
16 Q. Yeah. It's right after that you say look
17 at violent -- or look at relevant crimes at the
18 subject property for three-to-five-year period prior
19 to the incident and in the immediate vicinity of the
20 subject property for a three-to-five-year period.
21 I wanted to ask, obviously, subject
22 property. Are you talking about just the Kroger
23 store itself?
24 A. So when I pulled the crime data, it was
25 for all the addresses associated with the shopping

GILBERT & JONES

144

1 center. So I think they all share one address, if
2 I'm not mistaken, and then they have Suite A, B, C,
3 or whatever, you know, Unit A, B, C, or whatever it
4 is. So let me -- let me -- and I'll just throw out
5 all the answers here so then hopefully it'll help
6 understand.
7 Q. Yeah.
8 A. No. 1, in Georgia, my understanding of the
9 law is you only look at what's on the property and
10 what was known to the property owner. Okay. So
11 Georgia's got a very tight law as far as my lay
12 understanding of it.
13 No. 2, criminology has shown that crime in
14 the area, you know, unless it can be shown that it's
15 impacting the subject property is not relevant. And
16 that's been proven over and over and over again
17 through lots of studies, which I provided you in that
18 reference document.
19 Third, when I pulled the data, it was for
20 the shopping center. It was not just the Kroger.
21 That's why I'm aware of those other crimes.
22 So there's a lot of polls for service here
23 and I think even in the crime section, there's stuff
24 that didn't occur at the Kroger.
25 Q. Okay. What about -- how do you find

GILBERT & JONES

145

1 immediate vicinity when we're talking about that?
2 A. That's a great question. I don't have an
3 answer for that because there is no definition of
4 that. You know, like this term proximity comes out
5 of Texas law. And I asked an attorney to pull all
6 the security cases that reference proximity. And he
7 gave me a 3,000-page PDF, which I ain't reading. I
8 mean, and I don't really care what Texas law says. I
9 got to do it the way I say I got to do it.
10 So what I would say is that usually it's
11 the approaches to the property. Now, in the case of
12 a parking lot, they're all sharing a parking lot. So
13 it would be the parking lot, it would be the entire
14 shopping center and the approaches to it.
15 By definition, in criminology, the place
16 would be the Kroger because, you know, it meets -- if
17 you go back up to my definition of place, and I say
18 "my definition," the definition of place that I gave
19 you in the report, it's very small. It has one
20 address, one land parcel, one building. It has a
21 known geographic location. It is contained within
22 defined boundaries, and it serves one general
23 function.
24 That makes Kroger the place and the
25 shopping center the immediate vicinity by the way I

GILBERT & JONES

146

1 would look at it.
2 Q. Okay. Gotcha. The last question on
3 proximity. I mean, Kroger's obviously subscribing to
4 the Crimecast reports; right?
5 A. Yes.
6 Q. And in doing that, they're looking at
7 anywhere from a one-to-three-mile radius; right?
8 A. No.
9 Q. They're not?
10 A. No. You need to understand what CAP Index
11 is doing. CAP Index is endeavoring to give you a
12 risk score for a specific location using demographic
13 characteristics of that one-mile or three-mile or, in
14 some cases, two-mile and six-mile area. So it's
15 based on the demographics of those areas with the
16 intent of trying to give you a risk score for the
17 specific address.
18 Q. Okay. So there is --
19 A. The purpose is not trying to get a mile's
20 worth of crime. A mile radius of crime, if that's
21 what you're asking.
22 Q. What's the point of having a
23 one-to-three-mile radius then on these reports?
24 A. Well, I'll say the same thing Mr. Hughes
25 told you. Go and talk to the CAP Index. Because

GILBERT & JONES

**147**

1  I've never understood the logic of it either.
2      Q.    Okay.  Okay.  Yeah.  It's tough to see
3  because they have one to three, then they switch over
4  to two-mile radius?
5      A.    CAP won't tell you because it's
6  proprietary.  So I don't know.
7      Q.    Okay.  But these radiuses, at least, are
8  being given to Kroger for some reason.  Mr. Hughes,
9  your understanding, doesn't understand it?
10     A.    Well, they're giving you a risk score
11 based on the demographics of that one-mile radius or
12 three-mile radius or two-mile radius or six-mile
13 radius.  It's not -- it's not that they're giving you
14 the crime data for those areas.  They're giving you
15 the demographics for those areas and culminating them
16 into a score for that store.
17     Q.    Okay.  Do you know in this particular
18 case -- you may not.  I'm just curious -- whether or
19 not these Crimecast reports, are they just reporting
20 incidences that occur within the Kroger or the
21 shopping center, do you know?
22     A.    They're not reporting any incidences.
23 They're reporting the risk of those incidents based
24 on demographics.
25     Q.    Okay.  Try to explain that to me.  I know

**148**

1  that it's Crimecast that was confusing, but based on
2  demographics.
3      A.    Crimecast does not look at local crime
4  statistics at all.
5      Q.    Okay.
6      A.    It looks at demographics.  What they have
7  done is they've created basically a regression
8  analysis that has tried to correlate crime with
9  demographics.
10           And then once they've developed that, you
11 know, so -- the algorithm, so to speak, they then
12 apply that across the country.  So they go, okay, we
13 can easily get the demographics for a census track,
14 which is where those one-, three-, two-, six-mile
15 things come from.  Right?
16           It's ultimately looking at the
17 demographics of those census tracks and saying, okay,
18 if we have these certain characteristics of the
19 demography, okay, then we can -- we can correlate
20 that or we can attribute a certain type of risk to
21 those demographic characteristics.
22           And if you think about what demographic --
23 they say they don't take race into account.  I don't
24 know.  They say they don't take race into account,
25 but they take --

**149**

1      Q.    That was going to be my next question.
2  What are those demographics?  Do you have any idea?
3  If you don't, I mean --
4      A.    I have some idea but I cannot give you --
5  I cannot articulate all of them.  Certainly they take
6  into account single head of household --
7      Q.    Okay.
8      A.    -- economic status, education status,
9  those kinds of things.  Okay?  So what happened next
10 is based on a 1960's era theory called social
11 disorganization.  So if you look up social
12 disorganization theory as it was developed by the
13 Chicago school in the 1960's, that is where you can
14 get that information.  Because they're not going to
15 tell you because it's proprietary.  Okay?  But that's
16 the genesis of it.
17     Q.    Okay.
18     A.    I can't articulate every demographic that
19 they're looking at.
20     Q.    Do you believe -- do you have an opinion
21 on whether or not these Crimecast reports are in any
22 way helpful or supportive of determining a crime risk
23 in an area?
24     A.    What I can tell you is that they are
25 widely used.  There is no doubt that they are widely

**150**

1  used.  Every big corporation that I know of except
2  for a couple use CAP Index.  So there's a lot of guys
3  that are buying this stuff.  There's a lot of guys
4  that use it in their models.  I have seen CAP Index
5  correlate with crime.  I have seen it not correlate
6  with crime.
7            And I think that's what makes Kroger's
8  methodology good is that they are using multiple
9  factors.  They're not relying solely on CAP Index.
10     Q.    Right.  Right.  Okay.  Thank you.  I
11 struggle looking at those graphs, and I just wondered
12 if it's me being dense, which it probably is, but I
13 just --
14     A.    No.  You're not alone.
15           MR. SHIPLEY:  All right.  Guys, can we
16     take like five minutes, and then I've just got a
17     few more questions and we'll get out of here.
18           MS. O'HEARN:  Sure.
19           (Recess from 1:04 p.m. to 1:12 p.m.)
20     Q.    (By Mr. Shipley)  All right.  I want to
21 talk about the incident report.  So, obviously, that
22 you reference and that are out there just quickly.
23 I'm going to share.  I've done them all as one
24 composite exhibit.  Hopefully this helps.  I think
25 this is going to be Exhibit 7.

**151**

1    (Plaintiff's Exhibit 7 was marked for
2    identification.)
3    Q.    (By Mr. Shipley)  All right.  Can you see
4    those, Mr. Vellani?
5    A.    Yes, sir.
6    Q.    All right.  I just want to run through
7    these.  I'm going to try to go as quickly as we can
8    because I know you've got copies of all these things.
9         All right.  So first one, 4/27 of '17.
10   Police report listed as an armed robbery attempt.
11   And I don't know.  This is the one with the Starbuck
12   kiosk.  Have you reviewed that?
13   A.    I believe so, yes.
14   Q.    Okay.  You agree that's an attempted
15   assault as the police -- under Georgia law as the
16   police have noted it?
17   A.    I'm sorry.  You're saying -- I thought you
18   said attempted robbery.
19   Q.    I think they listed it as an attempted
20   assault.  I just read that.  Let's see.
21   A.    Well, under FBI --
22   Q.    Armed robbery attempt.
23   A.    Okay.  That would still count as a robbery
24   and would still be reportable to the UCR.
25   Q.    Okay.  Do you think that this is

**152**

1    substantially similar to Ms. Enzor's incident?
2    A.    Well, again, you're using the word
3    "substantially similar."  I don't know if that's
4    legalese or not.  I don't know.  But would it be
5    similar in my mind?  Yes.  Categorically it's an FBI
6    UCR violent crime.  So it's similar in that sense,
7    yes.
8    Q.    Okay.  This is the date July 8th of '18.
9    Police list it as a sexual battery misdemeanor.  This
10   is the incident where it says, "A light-skinned black
11   male in a red hat stuffed a dollar bill between her
12   shirt and her apron and repeated jabbing motion."
13   Would you believe -- do you believe that that is
14   substantially similar to Ms. Enzor's incident?
15   A.    By definition, it would be close.  It
16   would be a disorder crime, not a violent crime.  But,
17   again, like I told you under that VI CAP concept,
18   violent crimes are crimes against person, that it
19   would be similar, yes.
20   Q.    Okay.  This is an internal report from
21   11/8 of '18 from Kroger.  This is where, I believe,
22   it says, "A guy grabbed her arm and he put her in a
23   headlock."  And that was within Kroger.
24        Have you had a chance to review that
25   report?

**153**

1    A.    I don't specifically recall this one, but
2    I'm sure I looked at all of them.
3    Q.    Okay.  It says that --
4    A.    So I would have looked at it.
5    Q.    Yeah.  She -- left knee and some bruised
6    chin, hurt on top of head.  Would you deem this
7    substantially similar to Ms. Enzor's incident?
8    A.    Again, categorically, yes, it would be an
9    assault.  It was of a -- you know, it was an assault.
10   It was in the store.  So I would count that for sure.
11   Q.    Okay.  Let's see.
12   A.    But, again, remember what I said earlier.
13   That at the end of the day, we need to be doing
14   problem identification.  In neither of these --
15   neither any of these three were instructive of a
16   bathroom issue.
17   Q.    Okay.  And I understand that that's your
18   testimony there, and I certainly will note that, you
19   know, certain things can be noted in the deposition.
20   Let's see here.
21        This is an incident, aggravated assault,
22   hit-and-run.  It occurred on May 4th, '20.  This is
23   the one -- I don't know if you had a chance to
24   review -- this is where a woman related to the police
25   officers that a man or someone tried to -- a woman

**154**

1    tried to slash her on the throat.
2    A.    Yes.
3    Q.    Have you seen that?
4    A.    Yeah.  This was a road rage incident.
5    That was one of the ones I was alluding to.  This
6    one's also documented, you know, in the Kroger
7    reports.
8    Q.    Would it be substantially similar to the
9    crime Ms. Enzor suffered?
10   A.    Again, categorically, yes, it's an
11   aggravated assault.
12   Q.    Okay.  With your caveat about the
13   bathroom, not occurring in the bathroom?
14   A.    Again, the question is does the data
15   identify a consistent problem that would inform us as
16   to a problem and possibly solutions in the bathroom.
17   And none of these -- none of these incidents that we
18   talked about thus far, and none of the ones that I've
19   looked at were indicative of a bathroom problem or
20   potential solution.
21   Q.    Okay.  This is one I know we discussed
22   early on, May 8th of 2020.  This is the incident that
23   happened behind the Goodwill store, which is adjacent
24   to the Kroger store where a woman had told police
25   that three black males were shoving another black

**155**

1 male into a dark-colored Range Rover.
2 Do you believe that this incident would be
3 substantially similar to Ms. Enzor's?
4 A. So I think internally, I consider
5 kidnapping and kidnapping attempt to be an aggravated
6 assault even though technically it's not, according
7 to the FBI definition.
8 So, again, noninformative for the
9 bathroom, certainly. Don't know the exact nature of
10 it other than what's contained in the report, you
11 know. There's insufficient details for us to make
12 any real judgments on this particular one.
13 Categorically, it is not similar other
14 than the kidnapping element that the police brought
15 up in Ms. Enzor's situation. But categorically it's
16 not a violent crime. But I, like I said, internally
17 in my mind, I keep that, you know, kidnapping within
18 the confines of an aggravated assault. So I'm not --
19 I would not exclude this one. Let's put it that way.
20 Q. Okay. A couple more here. This one does
21 not have, I believe, a date, but I think that you can
22 look at the case number on there, and I believe that
23 this would be August 13th of 2020 based on how they
24 code these. Suspicious incident where a man claimed
25 that he was robbed at gunpoint at DeMarco's Pizza,

**156**

1 which is within the Berwick Shopping Center.
2 Do you consider that to be substantially
3 similar to Ms. Enzor's incident?
4 A. I would consider it informative, but
5 categorically would not be similar because it didn't
6 result in a crime. If you look at the way it's
7 categorized at the top, it's categorized as a
8 suspicious incident. They never gave it a crime
9 type.
10 Q. Gotcha. Two more. But there's a date on
11 this one, November 17th of '20. Aggravated assault,
12 terroristic threats, armed robbery, possession of a
13 firearm by taking.
14 Now, this one's a little different. This
15 is where a couple met, I believe, with the police in
16 the Kroger parking lot about a man that held them at
17 gunpoint with a shotgun in a homeless tent that was
18 within walking distance.
19 First of all, do you believe it's
20 substantially similar, just the incident itself?
21 We're not talking about proximity.
22 A. Well, I mean, again, categorically it
23 would be. But, you know --
24 Q. Yeah.
25 A. -- you'd have to take into consideration

**157**

1 that this didn't happen on the property. I mean,
2 that's always been the problem with maybe the reason
3 why I, you know, have done so much grocery store work
4 over the years is that, you know, they're typically
5 the anchor in a shopping center and historically free
6 cellphone, you know, people would get burglarized at
7 home, at their apartment, and they would drive over
8 to the Kroger and report that they were robbed.
9 So you have a couple problems. One is you
10 have the crime being reported in the wrong place and
11 people use the word "robbery" instead of "burglary,"
12 right, because they don't know the difference.
13 So, you know, in this situation, it didn't
14 occur on the property. The police just responded to
15 the property to, you know, meet these folks.
16 Q. Okay. Last one, I believe it's March
17 24th, '21. Discharged a firearm on the property.
18 This is when a woman came out and they were -- after
19 there were gunshots in the Berwick Shopping Center
20 parking lot, and I believe her window, rear window
21 had been broken out.
22 Do you think that this is in any way
23 substantially similar to the incident to Ms. Enzor?
24 A. Well, again, I mean, just, you know, just
25 for the record, you didn't ask me this earlier. I

**158**

1 haven't offered it. I don't discount -- I don't
2 ignore certain crimes. I take them all into
3 consideration. I may give them more weight to
4 certain crimes.
5 This is not a violent crime.
6 Q. Uh-huh.
7 A. This is, you know, I mean, it's dangerous
8 without a doubt, it's dangerous, but it's not a
9 violent crime categorically, according to the FBI.
10 So I wouldn't call this one similar, no.
11 Q. Okay.
12 A. It doesn't have a problem with
13 identification issue either.
14 Q. I appreciate that. I'm going to mark that
15 as Plaintiff's Exhibit 7. It's a composite of
16 excerpts of police reports predating Ms. Enzor's
17 incident. All right.
18 I want to move on, finish up. Kroger's
19 internal reports, and we've talked a little bit about
20 this already. My understanding is Kroger store 645
21 in Berwick Center had medium rating, internal rating
22 on a scale of low to high at the time of Ms. Enzor's
23 incident; is that correct?
24 A. No. On a scale of low, medium, high, max,
25 it had a medium.

**159**

1    Q.   Okay.  So you're saying there's an
2  additional category of max?
3    A.   Yes.
4    Q.   Okay.
5    A.   And I looked at my report and I should
6  have put that in there.  I just realized that I did
7  not put that in there.
8    Q.   Okay.
9    A.   There's actually four categories of
10  qualitative ranking that they give the stores.
11    Q.   Okay.  And my understanding, just so that
12  we're on the same page, and having reviewed
13  Mr. Hughes's deposition again trying to completely
14  understand it, it seems like you can distill this
15  down, there's three different factors that Kroger
16  uses to develop these security ratings -- or these
17  ratings; is that correct?
18    A.   Four, I thought.  It was -- hang on. Let
19  me go back to my report here.  So they -- the risk
20  matrix, again, it's evolved.  Okay?  CAP Index, LPMS
21  and shrink data, but then they also have the DAPM
22  input and can make decisions regarding -- you know, I
23  don't know if they changed the score.
24        I think, as I understood it, GO mandates
25  the security matrix, consists of X, but then also

**160**

1  gives authority on A, B and C, the three things we
2  talked about.  And then also gives authority to the
3  DAPM to override, maybe, would be the way to say it.
4    Q.   Yeah.  I think you're right.  I think
5  we're on the same page.  This is my understanding.
6  You tell me if this is yours.  That they look at the
7  CAP Index that we already talked about in the
8  Crimecast reports, and that's done by a third party;
9  right?
10    A.   Yes.  CAP Index is a separate company.
11    Q.   Okay.  Then I think there's the loss
12  prevention management system, which I think we were
13  provided.  It's almost like a, just a list of
14  incidents with dates that occurred with category
15  beside it.  And that's inputted by managers on site
16  generally?
17    A.   Well, it could be managers.  It could be
18  undercover guys.  It could be the DAPMs.  It's not
19  done by employees.  It's somebody in management or
20  above in the store.  And then there's undercover
21  guys, and then there's the DAPM people.
22    Q.   Right.  And then that was going to be my
23  third one was the DAPMs.  The district asset
24  protection managers have authority to do the -- when
25  faced with a certain incident, they can enter that

**161**

1  into that list of -- in the loss prevention
2  management system; isn't that right?
3    A.   Yes.
4    Q.   I think they kind of conflate, it seems
5  like.  You got managers and the other folks you're
6  talking about as well as the district managers are
7  able to get in there and enter data.
8        But essentially what my understanding is
9  it's a running list of crimes that occur within the
10  Kroger; is that right?
11    A.   Yeah.  I think it's more than that.  I
12  mean, it's a security incident reporting system.  So
13  my guess is they have more capabilities than just
14  that export of data that we've seen.
15    Q.   Uh-huh.
16    A.   You know, my guess is that they can, you
17  know, do, you know, different analytics on that
18  stuff, you know, trend the data by day of week, time
19  of day.  I'm sure there's more to it than just --
20  otherwise, it hey would just have an Excel
21  spreadsheet.  You know, it's more than an Excel
22  spreadsheet.
23    Q.   I gotcha.  I gotcha.  Well, in regards to
24  all of these, and we don't have to go through the CAP
25  Indexes and all that again, but you read Scott

**162**

1  Hughes's deposition; right?
2    A.   Yes.
3    Q.   And did you see where my partner, he
4  pointed out at least three or four different
5  incidences that were not categorized or were either
6  not contained or categorized appropriately within
7  their LPMS report?
8    A.   I wouldn't say they weren't appropriate.
9  I mean, I did see that they had some incidents that
10  they reported into LPMS, and some incidents that they
11  reported to Sedgwick.  You know, for better or worse,
12  that is where we're at in this industry is that you
13  have different reporting systems that are sometimes
14  redundant and sometimes there's disparity.
15        I write about this to every client that,
16  hey, you know, I want to look at all your workplace
17  violence incidents.  So give me the data.  They'll
18  give me the security data because I'm dealing with
19  security people.
20        And I know that's not everything in the
21  environments that I work in.  So I have to go over
22  here and pull this data from risk management, which
23  is like a risk management reporting system where most
24  of the incidents are reported to.  And then when you
25  match them up, when you marry them up, you see that