# EXHIBIT L

**Excerpts of 30(b)(6) Deposition of Representative Scotlon Hughes**

**Pages: 69-80**

# In The Matter Of:
*CAROLYN ENZOR vs.*
*THE KROGER CO.*

*SCOTLON HUGHES*
*March 9, 2023*
*THE KROGER CO.*



## JPA REPORTING, LLC
CERTIFIED COURT REPORTERS
404-853-1811    1-888-947-2963

*Min-U-Script® with Word Index*

Case 4:22-cv-00083-JRH-CLR   Document 31-12   Filed 07/17/23   Page 3 of 5

| CAROLYN ENZOR vs. THE KROGER CO. | THE KROGER CO. | SCOTLON HUGHES March 9, 2023 |

Page 69

[1] is actually the one that you're saying is included as
[2] 11/19?
[3]   A.   Is there anything on the page that says
[4] that?
[5]   Q.   Is there anything on the page, is there
[6] anything in the document, is there anything other than
[7] your own testimony that indicates that?
[8]   A.   I'm not sure.
[9]   Q.   Okay. In your mind as the -- sorry. I
[10] don't recall exactly your title -- assistant director
[11] of loss prevention and safety management, do you think
[12] that an assault should be input into Kroger's internal
[13] data as just an "other" event?
[14]   A.   One, I'm not in the habit of armchair
[15] quarterbacking what a manager put in at the time based
[16] on their understanding. There's additional information
[17] that this is a minor with autism so it wasn't, I think,
[18] on the face of it what you would look at as an assault.
[19] I believe the police handled it differently, you know,
[20] as a kid that had an episode that was emotionally
[21] disturbed. So "other" is not necessarily an improper
[22] designation.
[23]   Q.   So when it says on Exhibit No. 9 "Incident
[24] Date," that really doesn't mean anything, then?
[25]   A.   I believe this is the -- when the incident

Page 70

[1] was put into LPMS.
[2]   Q.   Okay. It doesn't say that. That's just
[3] what you suspect is true?
[4]   A.   Well, reviewing it in LPMS, that's the
[5] information that was in there because the narrative
[6] details did state the eleven I think it was eight or
[7] seven when the actual incident occurred.
[8]   Q.   Does it normally take 11 days to input
[9] data into LPMS?
[10]   A.   I don't know that I can give what the
[11] average is.
[12]         (Plaintiffs' Exhibit 10 was marked.)
[13]   Q.   (By Mr. Manly) Mr. Hughes, I'm going to
[14] show you what we've marked as Exhibit No. 10.  I'll
[15] represent to you that's the incident report -- the
[16] Chatham County Incident Report for the April 27th,
[17] 2021, rape involving Ka'La Enzor.
[18]         Would you look at Exhibit No. 9 and see if
[19] that incident is listed in the document?
[20]   A.   My understanding is that it's not.
[21]   Q.   Okay. And do you know why?
[22]   A.   My understanding is the information was put
[23] into Sedgwick and so store management believed that it
[24] had been reported since we had it in one of our systems
[25] so they didn't put it into LPMS as well.

Page 71

[1]   Q.   Isn't it conceivable that the November
[2] the 8th incident of an assault was not put in because
[3] store management thought that it was reported to
[4] someone else?
[5]         MS. O'HEARN: Object to the form.
[6]         THE WITNESS: No, because, again, I
[7] reviewed the information and I know that not to
[8] be accurate.
[9]   Q.   (By Mr. Manly) All right.
[10]         (Plaintiffs' Exhibit 11 was marked.)
[11]   Q.   (By Mr. Manly) Mr. Hughes, I'm going show
[12] you what's been marked as Exhibit No. 11 and I'll
[13] represent to you that that is an incident report
[14] produced by what was then the Savannah/Chatham Metro
[15] Police Department -- that's for a whole other story --
[16] and at the top it says "Armed Robbery Attemp" -- I can
[17] only presume it means attempted armed robbery -- and
[18] the address for this incident is the Kroger at 5720
[19] Ogeechee Road.
[20]         Are you familiar with this incident by any
[21] chance?
[22]   A.   Off the cuff, no. Hold on. Can I read
[23] through it --
[24]   Q.   Yeah.
[25]   A.   -- and let me see if it sparks a

Page 72

[1] recognition?
[2]   Q.   And I'll tell you my next question is, is
[3] why is this incident not listed on Exhibit No. 6.
[4]   A.   Okay. I am aware of this incident, yes.
[5]   Q.   Okay.
[6]   A.   And what was your follow-up? I apologize.
[7]   Q.   Why is it not listed on Exhibit No. 6
[8] which is the spreadsheet of 2020's risk assessment by
[9] Kroger -- sorry -- the Kroger CAP Index?
[10]         MS. O'HEARN: It's this one (indicating).
[11]         THE WITNESS: Right.
[12]   Q.   (By Mr. Manly) That's 9 you've got in
[13] front of you. I'm talking about 6.
[14]   A.   Yeah, I'm aware. I was looking at 9 to see
[15] what they coded it as because obviously they coded it
[16] as something other than what was in the risk index.
[17]         My understanding is no money was actually
[18] taken in this incident. I believe we have it in the
[19] LPMS. I want to say it was coded as harassment, but
[20] that's where I was willing to verify, is that.
[21]   Q.   I'll represent to you that it's not
[22] included in Exhibit No. 9.
[23]   A.   I would have to do more looking. I
[24] reviewed it. I know this incident is in LPMS. I think
[25] it was coded as harassment because it was determined

### Page 73

[1] that the females didn't actually feel threatened. This
[2] guy was making comments. They walked to and from the
[3] restroom and walked away. He had put a variety of
[4] things on the counter and they kind of just felt like
[5] he was being bothersome more than actually holding them
[6] up at gunpoint. I believe it was put in as harassment,
[7] which that's not one of the codings on the assessment.
[8] If you would like for me to verify that and have
[9] counsel --
[10]   Q.   What I'm getting at, Mr. Hughes, is the
[11] data that we've been provided by Kroger does not list
[12] that incident; is that correct?
[13]       MS. O'HEARN: Object to the form.
[14]       THE WITNESS: Without doing more research
[15]   I can't answer that.
[16]   Q.   (By Mr. Manly) Okay. And, again, that
[17] incident is not listed in Exhibit No. 6 either?
[18]   A.   Correct, because it was coded I believe as
[19] something different than the categories that No. 6
[20] utilizes.
[21]   Q.   Okay. Who makes that determination of
[22] what to categorize an event as?
[23]   A.   Sorry. Say that one more time.
[24]   Q.   Who makes the determination of how to
[25] categorize an event?

### Page 74

[1]   A.   It would be the person putting the case
[2] into LPMS.
[3]   Q.   And is that generally the store manager or
[4] management at the store?
[5]   A.   Either management or asset protection;
[6] usually one of the two.
[7]   Q.   Okay. And, again, I think we answered
[8] this early on, there's no oversight on that as in
[9] someone who might have received a copy of this
[10] incident report going back in and ensuring that it was
[11] coded correctly?
[12]   A.   I don't agree with the "coded correctly"
[13] terminology.
[14]   Q.   Okay. Or coded differently; how about
[15] that?
[16]   A.   There again, LPMS is a third-party software
[17] that many companies use. As such, you'll find
[18] softwares like that use oftentimes a wide assortment of
[19] terminology and there's discretion subjectivity as to
[20] what one person may think an incident is versus another
[21] person within all the given options.
[22]   Q.   Okay.
[23]   A.   So I don't know that you can say there's a
[24] correct or incorrect.
[25]   Q.   Okay. So when we talked about the

### Page 75

[1] subjective findings and going into this, is this what
[2] you're talking about?
[3]   A.   No.
[4]   Q.   Okay. So is this an additional subjective
[5] component that goes into coming up with the Kroger
[6] risk matrix?
[7]   A.   I would say it's subjective as to how
[8] management may put it in the LPMS. I don't think the
[9] risk matrix per se is subjective but, I mean, it can
[10] only use the information as it's given.
[11]       (Plaintiffs' Exhibit 12 was marked.)
[12]   Q.   (By Mr. Manly) Mr. Hughes, I'm going to
[13] show you what is marked as Exhibit 12.
[14]       MR. MANLY: I don't have another copy.
[15]   It's just been shuffled to another page there.
[16]       MS. O'HEARN: We can share.
[17]   Q.   (By Mr. Manly) I'm out of paper clips so
[18] we'll staple that.
[19]       Mr. Hughes, let me show you what's marked
[20] as Exhibit No. 12 to your deposition. If you could
[21] find that report on or that incident, rather, on
[22] Exhibit No. 9.
[23]   A.   I feel like I reviewed this. I'm not sure
[24] off the cuff.
[25]   Q.   You would agree it's not listed on No. 9?

### Page 76

[1]   A.   I don't agree or disagree. I'm trying to
[2] go off of memory and, I apologize, I feel like I
[3] reviewed this particular incident and that it may be in
[4] No. 9. I just can't tell you without doing more
[5] research.
[6]   Q.   You would agree that if you go by date
[7] order it's not listed on the -- in the chronological
[8] order as you would expect it to be on the
[9] second-to-last page of Exhibit No. 9?
[10]   A.   I do not see it in chronological order.
[11] Yes, I agree with that.
[12]   Q.   Okay.
[13]       (Plaintiffs' Exhibit 13 was marked.)
[14]   Q.   (By Mr. Manly) Mr. Hughes, I'm going to
[15] show you Exhibit No. 13.
[16]       MR. MANLY: Again, Beverly, I've got a
[17]   copy. I'll make sure you get it.
[18]   Q.   (By Mr. Manly) Can you find Exhibit
[19] No. 13 in the list that's been provided in Exhibit
[20] No. 9? Well, first of all, what is -- I highlighted a
[21] portion of that one.
[22]       What is the crime as reported by the
[23] police department on No. 13?
[24]   A.   The police have designated it as sexual
[25] battery, misdemeanor.

Page 77

[1] Q. Okay. And do you see that crime listed on
[2] the list of crimes in Exhibit No. 9?
[3] A. This one -- I believe this one may be the
[4] one listed on 7/14/18 as "Other." I would need to pull
[5] the further details, but I believe it may be that one.
[6] Q. Again, that date that you're -- the
[7] incident date as defined on Exhibit No. 19 does not
[8] correspond with the incident date that's on the
[9] incident report, does it?
[10] A. Again, my understanding is the dates that
[11] are on this particular spreadsheet are the dates that
[12] the incident was put into the system, not necessarily
[13] the date of the incident occurring. So, yes, 14 and 8
[14] are different dates, but I do believe this is the same
[15] incident.
[16] Q. And, again, other -- there is a -- is
[17] there a code for sexual battery?
[18] A. I would have to verify.
[19] Q. Okay. Is there a code for assault?
[20] A. There is for assault, I believe.
[21] Q. Okay. Is there a code for rape?
[22] A. I believe so.
[23] Q. Okay.
[24]    (Plaintiffs' Exhibit 14 was marked.)
[25] Q. (By Mr. Manly) All right. Let me show

Page 78

[1] you one more. I think this one's 14?
[2] A. Yes, you would be up to 14.
[3] Q. This is, Mr. Hughes, Exhibit No. 14 to
[4] your deposition. This is a Chatham County Police
[5] Department Incident Report from May the 8th of 2020
[6] which is a kidnapping.
[7]    Do you see that one on Exhibit No. 9?
[8] A. This one I don't believe we have on there.
[9] My understanding of this one when I reviewed it was
[10] that it happened at the Goodwill, not at the Kroger.
[11] Q. Okay. On the "Incident Location" it says
[12] Kroger parking lot or Kroger Shopping Center,
[13] something like that. I don't have it in front of me
[14] so I'm going by --
[15] A. Right. So it appears that the police
[16] officer generically called it the Kroger Shopping
[17] Center which it's not. We have one building in a mass
[18] of buildings. In the actual report itself it talks
[19] about being in the back of Goodwill and this person
[20] donating clothes in the back of Goodwill and observing
[21] the situation, so it doesn't look like it was anything
[22] that our store was involved in. I don't --
[23] Q. Despite the address being the same?
[24] A. Again, the address goes to a shopping
[25] center that has a variety of businesses. We don't know

Page 79

[1] everything that happens at the other businesses. We
[2] would have no way to.
[3] Q. You just indicated that you had reviewed
[4] this incident. When did you review it?
[5] A. With my attorney in preparation for the
[6] deposition.
[7] Q. Were you aware of this incident prior to
[8] preparing for the deposition?
[9] A. No.
[10] Q. Do you think that knowing about a
[11] kidnapping that takes place in the same shopping
[12] center is important for Kroger to know?
[13]    MS. O'HEARN: Object to the form.
[14] Q. (By Mr. Manly) You can answer if you
[15] know.
[16] A. I think important is an ambiguous term. We
[17] either know about it or we don't know about it.
[18] Q. Do you think you should know about it?
[19]    MS. O'HEARN: Object to the form.
[20]    THE WITNESS: I don't -- there again,
[21]   "should" implies a duty. I don't know how we
[22]   could know about something that we don't know
[23]   about. That doesn't feel logical.
[24] Q. (By Mr. Manly) Do you have access to Open
[25] Records Requests?

Page 80

[1] A. Do we have access to it?
[2] Q. Uh-huh.
[3] A. In theory, I guess we could.
[4] Q. Okay. So you could find out?
[5] A. Could we find out? Potentially, but you
[6] said "should" earlier and --
[7] Q. I understand what I asked. I'm asking you
[8] could you find out?
[9] A. Potentially we could.
[10] Q. Okay. And you chose not to?
[11]    MS. O'HEARN: Object to the form.
[12]    THE WITNESS: But, there again, I think
[13]   "chose" is a misrepresentation.
[14] Q. (By Mr. Manly) Do you regularly send an
[15] Open Records Request to find out incidents that took
[16] place in the area?
[17] A. No.
[18] Q. Do you solely rely on third parties in
[19] making the determination of whether or not your store
[20] is safe?
[21] A. No.
[22] Q. All right. That is Topic No. 1. We'll go
[23] to Topic No. 2, the written security plan for the
[24] site.
[25]    Is there a written security plan for the