# EXHIBIT "A"

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

CAROLYN ENZOR, as Next )
Friend of K.L.N.E. and )
K.A.E. and JULIANNE ) CIVIL ACTION FILE
GLISSON, as Temporary )
Administrator of the ) NO.: CV422-0836
Estate of Ka'La Enzor, )
                        )
        Plaintiffs, )
                        )
    vs. )
                        )
THE KROGER CO., )
                        )
_____Defendant._____ )

VIDEOCONFERENCE DEPOSITION OF

KARIM H. VELLANI, CPP, CSC

10:02 a.m.

June 14, 2023

Sugar Land, Texas

Annette Pacheco, RPR, RMR, CCR-B-2153

**Gilbert & Jones**

Certified Court Reporters

P. O. Box 1894 (31521)        P. O. Box 14515 (31416)
1607 Norwich Street           7505 Waters Avenue, F3
Brunswick, GA 31520           Savannah, GA 31406
        gilbertandjones1@gmail.com
            912.264.1670

51

1    violence assessments, security risk assessments.  I

2    mean, there's a myriad of things under the security

3    umbrella that I can handle.

4        Q.    Okay.  And thank you for that.  Two

5    different things.  You said there's vulnerability

6    assessments and then there's also threat assessments,

7    which combined allow you to perform a risk

8    assessment; is that correct?

9        A.    Yes.

10        Q.    What is the difference between the

11    vulnerability assessments versus the threat

12    assessments?

13        A.    So a threat assessment is looking at what

14    has happened or what could happen.  A vulnerability

15    assessment is looking at every opportunity regardless

16    of whether there is a threat associated with it.

17             And then a risk assessment is the better

18    approach, which is looking at, you know, the threats

19    and the vulnerabilities and what we're trying to

20    protect in conjunction.  So looking at those

21    collectively is when you're really looking at your

22    risks.

23             And the best example I can give you is,

24    you know, I live outside Houston.  Houston's, you

25    know, recognized as a pretty dangerous city.  I

52

1  wouldn't sleep with my window open at night because

2  there's lots of threats.  Not necessarily where I

3  live but in the area.  Okay?

4      Q.    Okay.

5      A.    So I wouldn't sleep with my window open.

6  That would be a vulnerability.  I have the

7  commensurate threat in the area.

8          But if I lived in Bozeman, Montana -- I

9  don't know if you've been to Bozeman.  It's a lovely

10 place -- you know, I would keep my window open even

11 though the vulnerability exists.  The threat's not

12 there, so the risk is not there.

13     Q.    Okay.  And I just read up a little bit on,

14 you know, some of your books and in other

15 publications.  Would that be more considered -- what

16 you just described there when you combine the

17 vulnerability assessments for the threat assessments,

18 is that more of the totality of the circumstances

19 approach?

20     A.    No.  That's a legal term.  I mean, that's

21 not -- you know, that's not -- that's -- there are

22 two -- we're operating two different worlds here.

23 You're talking about the legal concept and I'm

24 talking about the way things are done in the security

25 industry.

53

1          A security risk assessment takes into

2    consideration assets, what you're trying to protect,

3    threats, what you're protecting against, the existing

4    security measures that are in place to protect those

5    assets, and then the vulnerabilities that still

6    exist.  That gives you your risk assessment.

7          So totality of the circumstances is, my

8    lay understanding, is a concept in law where you can

9    look at kind of all hazards as opposed to only

10   looking at prior similar crimes when trying to

11   evaluate foreseeability.

12      Q.   Okay.  So you just said the totality of

13   the circumstances, that terminology is just legal?

14      A.   It's a term of art in your field.  It's

15   not a term of art that we use in our field.

16      Q.   Okay.

17      A.   At least my understanding of totality of

18   the circumstances.  I don't know what you're

19   referencing.

20      Q.   Yeah.  No.  I'm just curious.  I've read

21   about it in a number of these books.  I believe one

22   of your co-authors or one that you wrote a chapter in

23   the book, Norman Bates, he's a proponent of the

24   totality of the circumstances method; is that right?

25      A.   Well, Norm's an attorney.  So I'm guessing

**54**

1  that Norm wrote about the legal concepts.  That's why

2  I asked him to write a chapter in, you know, both

3  editions of *Strategic Security Management*.

4      Q.    Right.

5      A.    It's from a legal perspective.

6      Q.    Yeah.  And I think that's in Chapter 13

7  where Mr. Bates says:  "The major problems with prior

8  similar crime rules is the lack of clear direction on

9  what constitutes similar."  Do you agree with that?

10     A.    Okay.  So, I mean, I'm trying to make sure

11 you're understanding what I'm saying.  Norm's an

12 attorney.  So he's writing specifically on

13 foreseeability.  He's not talking about security risk

14 assessments.

15     Q.    Okay.  It's just in your book.  I mean, it

16 says he thinks the major problems of the prior

17 similar crime rule is the lack of clear direction on

18 what constitutes similar.

19           He says, "The legal effect of the prior

20 similar crime rule is to take black-and-white

21 position on the issue that either there was a risk of

22 certain type of crime or not.  However, the risk of

23 crime is not black and white.

24           "The more contemporary approach to

25 analyzing foreseeability is the totality of the

1   circumstances rule.  Under this rule, evidence is

2   typically allowed to show the existence of prior

3   dissimilar crime, crime in the neighborhood and other

4   factors to determine whether a crime is foreseeable.

5   By using the totality of the circumstances approach

6   to evaluate the level of risks, owners and managers

7   will be able to assess the risk of crime at their

8   properties than if they restricted their analysis to

9   only prior crimes."

10         You don't agree with that approach?

11         MS. O'HEARN:  Objection to form.

12   A.    Well, yeah.  That's got nothing to do with

13   risk assessments.  He's talking about this is what

14   the legal requirements are.  And he's, obviously,

15   he's not talking about Georgia, which is even, you

16   know, tighter, I would say, based on my lay

17   perspective of the law in Georgia.  So he's clearly

18   not talking about Georgia.  He's talking about if

19   there are these two concepts, then this is the

20   differences between them.

21         None of it matters if we're talking about

22   Georgia law.  And certainly none of it is addressing

23   security risk assessments.

24   Q.    Right.  And I think -- and I know that.  I

25   agree.  I know Georgia law on this.  And me and

1    Ms. O'Hearn know exactly what the courts analyze when

2    they're looking to see if there was -- if a certain

3    crime was reasonably foreseeable.  And it is, in

4    fact, as far as my understanding goes, looked at

5    prior similar crimes.

6              I'm just saying Mr. Bates says that a

7    better method is the totality of the circumstances.

8    And since you included it in your book, I just

9    wondered if you had any preference over the method

10   used.  Not in the legal context.  I'm talking

11   about --

12        A.    Yeah.

13        Q.    -- making a facility safe.

14              MS. O'HEARN:  Object to the form before

15        you answer, but go ahead.

16        A.    I think I understand your question.  I

17   mean, No. 1, it's not my place to judge the law in a

18   particular state.

19        Q.    (By Mr. Shipley)  I agree with that.

20        A.    No. 2, I would say that in the private

21   sector, what we engage in is called problem

22   identification.  Okay?  So we would look at the

23   specifics of what has occurred on the property to

24   identify whether we have reasonable security measures

25   in place to prevent further acts of a similar nature.

1    Okay?

2            And then we would also look at what does

3    the scientific literature say about the efficacy of

4    certain security measures.

5            So I'll give you an example.  We'll just

6    cut to the chase here.  The incident behind the

7    Goodwill or people getting in arguments about the

8    parking lot would not instruct me in any way, shape

9    or form to redesign the bathroom inside the Kroger

10   store.

11       Q.    Okay.  So we're getting into this.  The

12   parking lot, you know, is owned by Kroger; correct?

13           MS. O'HEARN:  Object to the form.

14       A.    I'm sorry.  Your question --

15       Q.    (By Mr. Shipley)  The majority of that

16   parking lot in the Berwick Shopping Center is owned

17   by Kroger?

18       A.    I don't know --

19           MS. O'HEARN:  Object to the form.

20           THE COURT REPORTER:  I'm sorry.  You're

21       talking over each other so I can't hear.  I

22       didn't hear what you said, Mr. Vellani.

23           MR. SHIPLEY:  Me?

24           THE COURT REPORTER:  No.  Mr. Vellani.

25       A.    I don't know the ownership or operations

1   of the parking lot.  That wasn't relevant in this

2   case.

3        Q.    (By Mr. Shipley)  So the only thing, and

4   we'll get into that later, but the only thing you're

5   looking at is any crime that's ever occurred within

6   the bathroom; is that right?

7        A.    No.  No.

8        Q.    That's it.  Just bathroom crimes?

9        A.    No.  You are putting words in my mouth.

10       Q.    No.  Is that what you're looking at?

11       A.    Yeah.  And now you're asking me a

12   question?  The answer is no, that is not what I

13   looked at.  I looked at the totality of where the

14   threats are occurring at the Kroger store and what

15   the nature of those threats were.

16       Q.    Okay.

17       A.    There was nothing -- what I'm saying is

18   there was nothing instructive in any of the crime

19   data or any of the internal reporting or any of the

20   security matrix that would inform me that there was a

21   problem in the bathroom.

22       Q.    By looking at the totality of the crimes

23   that occurred there prior to Ms. Enzor's kidnapping,

24   rape and battery.

25       A.    I'm sorry.  Is that a question or a

1    in any way was a --

2         A.    I'm sorry.  The last part of your -- the

3    last part of what you said I didn't quite get.

4         Q.    So the kidnapping that you reference

5    behind the Goodwill store, which is adjacent to

6    Kroger, you do not believe is similar to the crime

7    that Ms. Enzor suffered?

8         A.    No.  I wouldn't say it's not similar.

9    Okay?  Categorically it would be somewhat similar.

10   Okay?  And when I'm saying that, when I say

11   categorically, I'm talking about under FBI

12   definitions and UCR requirements, the crime of

13   kidnapping is actually one that is not collected.  I

14   still look at it and put it under the category of an

15   aggravated assault and, therefore, under the category

16   of violent crimes.

17             So categorically it would be similar.  But

18   the fact that there's stuff going on in the parking

19   lot, whether it's a road rage incident or customers

20   getting into a fight over a parking spot or a

21   kidnapping or attempted kidnapping behind the

22   Goodwill store, that does not inform me from a

23   problem identification perspective that there was a

24   problem on the -- in the bathroom inside the Kroger

25   store.

80

1    traveled at all to the state of Georgia for this

2    case?

3        A.    Not for this case, no.

4        Q.    So safe to say you've never been to the

5    Berwick Kroger in Savannah, Georgia?

6        A.    Correct.

7        Q.    Okay.  And you've never laid eyes on the

8    bathroom as it existed, for the condition that

9    existed at the time of Ms. Enzor's incident?

10       A.    No, sir.

11       Q.    Okay.  And you haven't seen the bathroom

12   since it's been altered in any way?

13       A.    No, sir.

14       Q.    Okay.  Did you interview any other Kroger

15   employees other than Mr. Hughes?

16       A.    No, sir.

17       Q.    Okay.  Did you attempt to interview the

18   manager, I believe it was a Mr. Edwards who was

19   managing the Kroger on April 27th of '21?

20       A.    No.  I didn't try to speak to Tim Edwards.

21       Q.    Okay.  Had you ever spoken to Tim Edwards

22   before?

23       A.    No, sir.

24       Q.    Okay.  And we took some depositions last

25   week.  Apparently Mr. Edwards left Kroger

1    that.

2         A.    Yeah, I wouldn't doubt that.  I mean,

3    that's -- that would be -- I mean, again, when you

4    develop policy, if the directive is to a certain

5    subset of the employee population, then there would

6    really be no reason for anybody else to receive it.

7         Q.    Why wouldn't they want to get a copy of

8    that?  You've written in your report on page 29 that

9    Kroger employees are the eyes and ears of the store.

10   What does that mean?

11        A.    Well, I mean, at its most basic level, as

12   we would say it today, it's see something, say

13   something.  It doesn't mean you need to take action

14   to do anything, but it's report it to a manager or

15   report it to loss prevention or asset protection.

16             I mean, you wouldn't want -- you wouldn't

17   want -- I mean, organizationally, you have divisions

18   of labor.  So certain people are authorized to do

19   certain things.  Other people are not authorized to

20   do those things.

21             Like, for example, when I work on a bigger

22   consulting project, and we've got several of them

23   going on right now, the consultants that are working

24   with me are not authorized to interface with the

25   client.  That's my job.  So I wouldn't give them

1      A.    I'd rather push through as well.  I'm with

2 you.

3      Q.    Okay.

4      A.    So sorry.  Similarity.

5      Q.    Yeah.  Similarity.  All right.  So we can

6 agree that Chatham County police report documented

7 Ms. Enzor's incident as an abduction, rape and

8 battery; is that right?

9      A.    Yes.

10      Q.    All right.  And it seems as if, according

11 to your report, you'd be looking for crimes that are

12 similar to these three type crimes that occurred

13 prior to Ms. Enzor's incident?

14      A.    So at a base level, as I said earlier,

15 we're looking, you know, categorically as to what

16 kind of crime this is.  Is it a violent crime?  Is it

17 a property crime?  Is it a disorder crime?  So that's

18 the top-level analysis.

19            Categorically, those other three crimes

20 are similar.  But once you dig down deeper into them

21 and the unique nature of this crime tells you that

22 it's different.  But I would still count them, you

23 know, within the analysis of similar because

24 categorically they're the same.

25      Q.    Okay.  You just have another distinction

1    and that's the unique nature of a specific crime?

2         A.    Correct.  Because in order to solve a

3    crime problem, you have to understand the crime

4    problem.  So, in other words, putting lighting up and

5    cameras up in the parking lot is not going to make a

6    hill of beans difference in this case.

7         Q.    Okay.  All right.  So what type of

8    crimes -- if you were to make -- I think you

9    testified that you don't have any opinions on whether

10   or not this crime was reasonably foreseeable; is that

11   correct?

12        A.    Correct.

13        Q.    Okay.  But you are interested in looking

14   at prior crimes.  They are all throughout your

15   report; is that correct?

16        A.    I'm interested in looking at prior crimes

17   to identify what the problem is and what Kroger

18   responded effectively to the problems that they were

19   experiencing.  And there's nothing in their records

20   and there's nothing in the police records that tells

21   me that the bathroom was something that we should be

22   concerned about either from a quantitative

23   perspective or from a qualitative perspective.

24        Q.    Okay.  Would you be looking at things such

25   as armed robberies?

1      A.      Again, just categorically, that would be a

2  violent crime, yes.

3      Q.      Okay.

4      A.      Because they have to be armed.

5      Q.      Okay.  Assaults?

6      A.      Well, assaults are a different category.

7  Assaults are disorder crime.  You can put them under

8  the category of what I might, you know, used to call

9  VI count, which is violent crimes or crimes against

10 persons.

11          So assaults are tricky because assaults

12 can be -- you know, you can be assaulted when you

13 receive a threat by Facebook.  That would be an

14 assault even though there's no physical proximity.

15          So assaults are a tricky category because

16 assaults is a very broad crime.  It covers a lot of

17 ground.  It covers everything from, you know, me

18 coming and punching you on the shoulder to me sending

19 you a threat from, you know, Ukraine.  Okay?  Or

20 Russia or whatever.  I don't want to single one of

21 those countries out, but you get my point.

22          If I send you an internet threat, that is

23 an assault.  If I come and punch you on the arm

24 inside the Kroger, that would be an assault.  So

25 assaults depending on their nature may be more

1  relevant.

2      Q.    Okay.  Along those lines -- and just to go

3  a little deeper into that, I think there's some

4  sections in your book or in your report you talk

5  about stranger crimes versus nonstranger crimes; is

6  that right?

7      A.    Yes, sir.

8      Q.    And you'd agree that stranger crimes, at

9  least according to your report, are easier to prevent

10 than nonstranger crimes; is that correct?

11     A.    Yeah.  If there's usually more opportunity

12 to do so.  In other words, when you have domestic

13 violence, when you have domestic partners who are

14 authorized to be near each other, you know, there's

15 less opportunity to intervene.

16          And sometimes as, you know, you and I may

17 know, you know, the domestic partner may explode into

18 violence at times or, you know, things get a little

19 bit more heated; right?  I don't know anything about

20 that.

21     Q.    Me either.

22     A.    Yeah.  I mean, stranger crimes generally

23 are what security is trying to prevent.  Domestic

24 crimes are nonstranger crimes, usually very difficult

25 to prevent.  You sometimes can intervene.

1          In this situation, you know, we've got

2     obviously a private area in terms of a lady's

3     bathroom.  I mean, you've got the quick intervention

4     by the Kroger personnel.

5          Q.    Okay.  Okay.  Second thing, I think you

6     talked about other similarity in crimes.  Next is the

7     frequency of the crimes; right?

8          A.    Yes, sir.

9          Q.    And it's measured by crime patterns,

10    trends and rates?

11         A.    Yes, sir.

12         Q.    Is that how you look at it?

13         A.    Yes.

14         Q.    Okay.  One thing I had a question under

15    there is crime rates.  It appears as if you've -- I

16    think you've given an analysis when you look at a

17    certain crime within a thousand people; is that

18    right?

19         A.    Yeah.  That's standard crime analysis

20    methodology, standard FBI methodology.  When you hear

21    on the news, for example, that the crime rate in the

22    City of Savannah is going up or going down, what

23    they're referencing specifically is the crime rate in

24    the City of Savannah, which is calculated based on

25    two pieces of data:  One, the population of the city

1    and, two, the violent crime level in the city.  And

2    that's put in context.

3        Q.    Okay.  And your conclusion based on your

4    analysis is that this Berwick Kroger was suffering a

5    lower crime rate than Chatham County in general;

6    right?

7        A.    Well, the point is that you're at less

8    risk at the Kroger than just generally in Chatham

9    County.  I mean, obviously, there's a lot of crimes

10   that occur in public streets, you know, on parking

11   lots and whatnot.

12            So the point is that, you know, if you're

13   to do the crime rate comparison, which is more of a

14   barometer.  Okay?  Like, you know, I do worry about

15   properties when the crime rate is three times the

16   city's average.  That's not a great look.  Right?

17            In this situation, we've got a crime rate

18   at the store that is significantly lower than just

19   the city in general.

20       Q.    Or the county in general?

21       A.    Yeah.  The county, yeah.  Thank you.

22       Q.    Yeah.  Because you picked Chatham.  But

23   isn't the fact that you picked Chatham to compare it

24   to, isn't that completely subjective in nature?

25   That's just your choice to use Chatham County.

1    A.   It wasn't subjective in nature.  It was

2 the fact that the police department somehow unified

3 with the county at some point.  That wasn't a

4 decision I made.  Normally I would look at the city.

5 But in this case you can't do that because my

6 understanding is it's one police department.

7    Q.   Well, have you ever been to Chatham

8 County?

9    A.   I have.  I was there last year, I think.

10    Q.   Okay.  Were you here for work or . . .

11    A.   Yes.  I've been there for conferences.

12 I've been there for fun.  I've been there to help

13 protect a friend in a situation.  And I have been

14 there for an expert case.

15    Q.   Okay.  But not for this particular case;

16 correct?

17    A.   I have been for that particular case, no.

18    Q.   Do you know how many municipalities are

19 within Chatham County?

20    A.   No.  I think, and I could be wrong on

21 this, but I thought that this particular police

22 department joined together with Chatham County or

23 that this Kroger store was within Chatham County.

24    Q.   It is within Chatham County.  I certainly

25 would agree with that.  Now --

1          A.    It's not within the city limits of

2    Savannah or something; right?  I mean, isn't that --

3          Q.    That's right.  That's right.  It's within

4    Chatham County but not within the city limits.  But,

5    you know, I represent there is at least seven

6    municipalities within Chatham County.

7                And I guess my question to you is wouldn't

8    it be more reliable to say, for instance, pick the

9    ZIP Code that this Kroger, Berwick Kroger was located

10   in when you're trying to make a comparison as you

11   have?

12         A.    No, because you don't know what the

13   population is of the ZIP Code.

14         Q.    You can't figure that out?

15         A.    I don't know any accurate way to do that.

16   I mean, that's not something that's published, to my

17   knowledge.  You could do it -- so here's the problem.

18   Your question is totally legitimate.  Okay?

19                The problem -- you would -- ideally you

20   would want to do it for a police beat because we've

21   got the crime stats for the police beat, and -- but

22   we don't have the population for a police beat.

23   We've got the population of a census track, but we

24   don't have the population of a census track.

25                We've got, you know, we could possibly

1    get -- I don't know if you can get the crime data for

2    the ZIP Code or not, but we don't have the

3    population.  Or maybe you can, I don't know, for a

4    ZIP Code.

5               The only -- the only place where you --

6    the next level where you have both the population and

7    the crime numbers is the city.

8               Now, I wish that we did, you know,

9    populations for police beats but we don't.  I wish we

10   had crime data for census tracks, but we don't.  You

11   know, ZIP Codes has always been kind of wonky because

12   if you think about what a ZIP Code is, that's neither

13   -- that's not -- a ZIP Code is not created for

14   purposes of population or crime data.  The ZIP Code's

15   purpose is for distribution of mail.  So the ZIP

16   Code's not a great measure anyway.

17               I always laugh when I see those in the

18   newspaper, top 10 worst ZIP Codes in the city of

19   Houston.  I mean, I don't even know why that makes

20   any sense to anyone, you know.

21        Q.    Right.

22        A.    It's an arbitrary thing that's created --

23   I don't know if it's arbitrary.  It's something that

24   was created specifically for the mail service.

25        Q.    Yeah, I know.  But what I'm saying -- and

1    I'm using ZIP Codes by example.  But doesn't it give

2    you a more narrow -- not just a narrow, but a more

3    reliable look on the area that is surrounding this

4    Kroger?

5         Like, for instance, by your analysis, you

6    are factoring in, well, one of the municipalities,

7    Port Wentworth, the City of Savannah, which all have

8    crime that is astronomical, which may be completely

9    different to other areas or where the Kroger is.

10   It's just don't you need to look at more of the

11   immediate surrounding area when you're coming up with

12   that stat?  Don't we need to be more reliable?

13       A.    Yes.  Your question's really a good one.

14   Okay.  It really is a good one.

15       Q.    Finally.

16       A.    The problem is there's an absence of data

17   that would allow you to do what you're suggesting.

18   It's a good idea --

19       Q.    Yeah.

20       A.    -- but there is no way to physically do

21   it.

22       Q.    Okay.  I understand.  Thank you.  And I

23   did notice in there that you -- I think this is based

24   on this information that was out there.  You based it

25   just on 2018; right?

1      A.    Yes.

2      Q.    Okay.  '19, '20, '21 weren't available?

3      A.    Yeah.  There was a reason for that.  I

4 think I footnoted it, if I'm not mistaken.  I'm

5 trying to getting back to my report.  I've got 50

6 tabs open here now with -- hang on a second.  I've

7 still got the LP manual open and the risk assessment

8 methodology and Mr. Benson's report and my contract.

9          So there was a reason why I did.  Yeah,

10 only 2018 was available.  So 2019 to '21 wasn't

11 available from the FBI.  So --

12      Q.    Okay.  I just wanted to make sure.

13      A.    -- that's embarrassing, but, you know,

14 that's the only thing I could do.

15      Q.    Okay.  I gotcha.  Moving on, recency.

16 Let's see.  And I guess I'm more -- I guess that goes

17 to what we just talked about.  We're looking at 2018.

18 We're not looking at '19 and '20.  I mean --

19      A.    No, no, no.  That's -- no, no.  As far as

20 Chatham County --

21      Q.    Yes.

22      A.    -- we're not looking at it because it

23 doesn't exist.  But, no, I certainly looked at the

24 crime data for, you know, for the entire time period

25 that was relevant here up to April 27, 2021.

1    Q.    For the Kroger Berwick; right?

2    A.    For the Kroger, yeah.

3    Q.    Okay.

4    A.    I can't do anything with stats if it don't

5    exist for the county.

6    Q.    Gotcha.  Okay.  I thank you for that

7    distinction.

8          And I believe in your report you talk

9    about when assessing the actual threats, the

10   following may be considered relevant crimes for a

11   three-to-five-year period.  You chose three.  Why did

12   you choose three instead of five?

13   A.    So I always do that in every case.  I look

14   at three calendar years and up until the date of the

15   incident in the subject year.  So that is a

16   standardized methodology that is consistent with the

17   IAPSC methodology.  And I use that same methodology

18   with my crime analysis clients.  I use the same

19   methodology when I'm doing consulting projects, and I

20   do the same methodology in every case.

21         It makes every Texas attorney mad at me

22   because there's case law in Texas you only got to

23   look at two years.  Here comes their expert going,

24   no, I'm looking at three years, you know.

25   Q.    Okay.

142

1          A.    I use a standardized methodology across

2     the country.

3          Q.    Okay.  But it would not be wrong to look

4     at a five year as well?

5          A.    It wouldn't be, but you've got to apply a

6     recency test; right?  I mean, you can look at five

7     years back and see that the, you know, in some

8     cases -- I had a case a couple years ago where if you

9     look five years back, the property was one of those

10    that I told you was -- in that case it was six times

11    the city's violent crime rate.  But in the three

12    years prior to the incident, you know, the crime rate

13    was zero.  It was amazing.  The property manager was

14    just absolutely amazing on that case, on solving the

15    problem and then obviously on the case.

16              So the further back in time you go, the

17    more nuanced the data's going to get.  The more --

18    the less helpful it's going to get.  It can sometimes

19    tell a nice story like in that case.

20         Q.    Uh-huh.

21         A.    But, you know, generally back, generally

22    the further back in time, you're going to give it

23    less weight anyway.

24              When I develop methodologies like the

25    security matrix for clients, you know, I'm weighting

1    crimes that are more recent heavier than I am crimes

2    that are further back in time.  And that's arbitrary.

3            You can go, you know, every crime in the

4    last year is worth three points.  Every crime two

5    years ago is worth two points.  Every time three

6    years ago is worth one point.  I mean, it's

7    arbitrary, but the point is you want to apply a

8    recency test.

9            But, yes, can you go back five years?

10   Yes.

11       Q.    Okay.  Moving on, proximity.  That, I

12   believe, is the fourth factor that we're looking at

13   under, I think what you had deemed it was a

14   quantitative analysis?

15       A.    Yes, sir.

16       Q.    Yeah.  It's right after that you say look

17   at violent -- or look at relevant crimes at the

18   subject property for three-to-five-year period prior

19   to the incident and in the immediate vicinity of the

20   subject property for a three-to-five-year period.

21           I wanted to ask, obviously, subject

22   property.  Are you talking about just the Kroger

23   store itself?

24       A.    So when I pulled the crime data, it was

25   for all the addresses associated with the shopping

1  center.  So I think they all share one address, if

2  I'm not mistaken, and then they have Suite A, B, C,

3  or whatever, you know, Unit A, B, C, or whatever it

4  is.  So let me -- let me -- and I'll just throw out

5  all the answers here so then hopefully it'll help

6  understand.

7          Q.    Yeah.

8          A.    No. 1, in Georgia, my understanding of the

9  law is you only look at what's on the property and

10  what was known to the property owner.  Okay.  So

11  Georgia's got a very tight law as far as my lay

12  understanding of it.

13              No. 2, criminology has shown that crime in

14  the area, you know, unless it can be shown that it's

15  impacting the subject property is not relevant.  And

16  that's been proven over and over and over again

17  through lots of studies, which I provided you in that

18  reference document.

19              Third, when I pulled the data, it was for

20  the shopping center.  It was not just the Kroger.

21  That's why I'm aware of those other crimes.

22              So there's a lot of polls for service here

23  and I think even in the crime section, there's stuff

24  that didn't occur at the Kroger.

25          Q.    Okay.  What about -- how do you find

1    immediate vicinity when we're talking about that?

2         A.    That's a great question.  I don't have an

3    answer for that because there is no definition of

4    that.  You know, like this term proximity comes out

5    of Texas law.  And I asked an attorney to pull all

6    the security cases that reference proximity.  And he

7    gave me a 3,000-page PDF, which I ain't reading.  I

8    mean, and I don't really care what Texas law says.  I

9    got to do it the way I say I got to do it.

10         So what I would say is that usually it's

11   the approaches to the property.  Now, in the case of

12   a parking lot, they're all sharing a parking lot.  So

13   it would be the parking lot, it would be the entire

14   shopping center and the approaches to it.

15         By definition, in criminology, the place

16   would be the Kroger because, you know, it meets -- if

17   you go back up to my definition of place, and I say

18   "my definition," the definition of place that I gave

19   you in the report, it's very small.  It has one

20   address, one land parcel, one building.  It has a

21   known geographic location.  It is contained within

22   defined boundaries, and it serves one general

23   function.

24         That makes Kroger the place and the

25   shopping center the immediate vicinity by the way I

1     A.    I don't specifically recall this one, but

2   I'm sure I looked at all of them.

3     Q.    Okay.  It says that --

4     A.    So I would have looked at it.

5     Q.    Yeah.  She -- left knee and some bruised

6   chin, hurt on top of head.  Would you deem this

7   substantially similar to Ms. Enzor's incident?

8     A.    Again, categorically, yes, it would be an

9   assault.  It was of a -- you know, it was an assault.

10  It was in the store.  So I would count that for sure.

11    Q.    Okay.  Let's see.

12    A.    But, again, remember what I said earlier.

13  That at the end of the day, we need to be doing

14  problem identification.  In neither of these --

15  neither any of these three were instructive of a

16  bathroom issue.

17    Q.    Okay.  And I understand that that's your

18  testimony there, and I certainly will note that, you

19  know, certain things can be noted in the deposition.

20  Let's see here.

21          This is an incident, aggravated assault,

22  hit-and-run.  It occurred on May 4th, '20.  This is

23  the one -- I don't know if you had a chance to

24  review -- this is where a woman related to the police

25  officers that a man or someone tried to -- a woman

1    tried to slash her on the throat.

2        A.    Yes.

3        Q.    Have you seen that?

4        A.    Yeah.  This was a road rage incident.

5    That was one of the ones I was alluding to.  This

6    one's also documented, you know, in the Kroger

7    reports.

8        Q.    Would it be substantially similar to the

9    crime Ms. Enzor suffered?

10        A.    Again, categorically, yes, it's an

11    aggravated assault.

12        Q.    Okay.  With your caveat about the

13    bathroom, not occurring in the bathroom?

14        A.    Again, the question is does the data

15    identify a consistent problem that would inform us as

16    to a problem and possibly solutions in the bathroom.

17    And none of these -- none of these incidents that we

18    talked about thus far, and none of the ones that I've

19    looked at were indicative of a bathroom problem or

20    potential solution.

21        Q.    Okay.  This is one I know we discussed

22    early on, May 8th of 2020.  This is the incident that

23    happened behind the Goodwill store, which is adjacent

24    to the Kroger store where a woman had told police

25    that three black males were shoving another black

1    male into a dark-colored Range Rover.

2           Do you believe that this incident would be

3    substantially similar to Ms. Enzor's?

4    A.     So I think internally, I consider

5    kidnapping and kidnapping attempt to be an aggravated

6    assault even though technically it's not, according

7    to the FBI definition.

8           So, again, noninformative for the

9    bathroom, certainly.  Don't know the exact nature of

10   it other than what's contained in the report, you

11   know.  There's insufficient details for us to make

12   any real judgments on this particular one.

13          Categorically, it is not similar other

14   than the kidnapping element that the police brought

15   up in Ms. Enzor's situation.  But categorically it's

16   not a violent crime.  But I, like I said, internally

17   in my mind, I keep that, you know, kidnapping within

18   the confines of an aggravated assault.  So I'm not --

19   I would not exclude this one.  Let's put it that way.

20   Q.     Okay.  A couple more here.  This one does

21   not have, I believe, a date, but I think that you can

22   look at the case number on there, and I believe that

23   this would be August 13th of 2020 based on how they

24   code these.  Suspicious incident where a man claimed

25   that he was robbed at gunpoint at DeMarco's Pizza,